UNITED STATES of America, Appellee,

v.

Stephen R. GIBSON, a/k/a Keith Miller, Appellant.

No. 93–3022.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1994.

Decided April 1, 1994.

Allen E. Burns, Asst. Federal Public Defender, argued the cause, for appellant. With him on the briefs were A.J. Kramer and Beth Brinkmann, Federal Public Defenders.

M. Evan Corcoran, Asst. U.S. Atty., argued the cause, for appellee. With him on the brief were J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, John R. Fisher, Thomas J. Tourish, Jr. and James A. Meade, Asst. U.S. Attys.

Before: EDWARDS, SILBERMAN, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

As Fed.R.Crim.P. 11(a)(2) allows, Stephen R. Gibson entered a conditional guilty plea to possession with intent to distribute cocaine base (21 U.S.C. § 841(a)(1), (b)(1)(B)(iii)).. In this appeal from the judgment of conviction, he exercises his reserved right to review of the district court's denial of his suppression motion.

The facts tell a familiar story. On August 11, 1992, Gibson left New York City for Columbia, South Carolina, on board a Florida-bound Amtrak train. In Washington, D.C., Investigator Thomas M. Cook, a ten-year veteran of the Amtrak Railroad Police, began checking the train's passenger manifest. His eyes were drawn to "Keith Miller," the alias Gibson adopted for his trip. Cook's job was to look for unusual travel patterns in the hope of identifying persons using Amtrak to transport contraband. "Keith Miller" became a candidate because he was leaving a drug-source city; because he held a one-way ticket; because he purchased his ticket only 5 minutes before the train pulled out, although he made his reservation the day before; because he paid in cash ($129); because

Miller gave a telephone number with a New York area code, which he designated a business number, when he made his reservation for a one-way ticket south; and because Cook received no answer when he called the number at 11:40 a.m. and 1:15 p.m.

Cook notified a detective in the Metropolitan Police Department and another Amtrak investigator. When the train arrived in Washington shortly before 2:00 p.m., all three boarded and in a short time found "Keith Miller," whom we shall hereafter refer to as Gibson.

The usual ritual then began. Cook identified himself as a police officer and asked in a conversational tone to see Gibson's ticket. Gibson handed him the ticket, and Cook returned it. When Cook asked for identification, Gibson replied that he had none, adding that he had been in New York for a funeral. Cook asked how he had gotten to New York. Gibson said by train.

In response to Cook's questions, Gibson denied having any drugs or weapons. Cook then requested permission to search Gibson's luggage. Gibson consented. Cook found only "very dirty, very casual clothes." This struck Cook because "there was absolutely nothing in there that would have been appropriate to attend a funeral." Feeling "fairly confident" Gibson was lying, Cook asked Gibson if he could pat him down. Although Cook did not remember what Gibson said, he testified that Gibson consented and stood up. Near Gibson's left pants pocket Cook "felt a flat hard object as though it were in the pockets." "It was large enough and flat enough and yet angular as though I felt— excuse me, it didn't correspond with anything that I might have expected to find in a pants pocket such as keys or, say, a small address book or something like that." So Cook asked Gibson to empty his pockets. Gibson emptied his right pocket, but not his left. Cook then touched the "lump" and asked what it was. Gibson said he was wearing another pair of pants underneath.

Cook did not believe Gibson's explanation and asked him to go to the restroom at the end of the car for a full search. According to Cook, Gibson agreed to go. According to Gibson, he was forced to go. Cook led the

way; Gibson followed; the two other officers brought up the rear. Cook and Gibson went into the bathroom. The other officers apparently remained outside. Cook pulled down Gibson's outer pair of pants to expose the second pair of pants. In the second pair he found a package wrapped in tissue paper. The package consisted of a plastic bag containing a white rock substance.

Gibson was formally arrested and taken off the train. The police detective found another, similarly wrapped packet in Gibson's right pocket. At the police station, Gibson gave a voluntary confession admitting that he had been carrying drugs for the purpose of delivering them to another individual.

The district court refused to suppress the tangible evidence taken from Gibson. Although Gibson had not voluntarily consented to the bathroom search, the court thought the police already had probable cause to arrest him (and therefore could legally search him incident thereto). The court relied on Gibson's apparently false responses, particularly his statements about the funeral and about having travelled to New York by train; his lack of identification; his suspicious demeanor; and Cook's feeling the object in Gibson's pants.

■ The government concedes that the bathroom search violated the Fourth Amendment unless it was incident to a lawful arrest. The question therefore is whether there was probable cause to arrest Gibson before his trip to the bathroom. *See Florida v. Royer,* 460 U.S. 491, 499–503, 103 S.Ct. 1319, 1325–1327, 75 L.Ed.2d 229 (1983) (plurality opinion). Two of the factors the district court mentioned in support of its probable cause finding have no evidentiary basis, and the government does not rely on them: there is no evidence that Gibson's demeanor was out of the ordinary; and none of the records Cook examined before boarding disproved in the slightest Gibson's claim that he had travelled to New York by train.

What remains is insufficient to establish probable cause to arrest. We suppose that travelling from New York City by train, paying cash for the ticket and purchasing it at the last minute, are some slight indication

the passenger is carrying drugs. All we can say with confidence is that these factors, considered together, raised Cook's suspicions and prompted him to investigate further. *See United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989); *Illinois v. Gates,* 462 U.S. 213, 243, 103 S.Ct. 2317, 2334–2335, 76 L.Ed.2d 527 (1983); *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980); *United States v. Colyer,* 878 F.2d 469, 482 (D.C.Cir.1989); *United States v. Carrasquillo,* 877 F.2d 73, 76 (D.C.Cir.1989). The unanswered telephone calls add something, but not much. Perhaps drug dealers are in the habit of leaving fake callback numbers; on this record we can only speculate. But the number Gibson gave when making his reservation apparently was an operating number. Cook thought it "unusual" that a "business" number would not be answered on a weekday. Did he therefore surmise that Gibson might have made up a number that happened to correspond to a real residential number? He was never asked. The significance of the unanswered calls is diluted still further by the facts that Cook's calls were made around lunchtime and that Gibson never described the nature of the business.

The events that transpired on the train, up to the pat down, were surely insufficient to justify arresting Gibson. He did not have any identification. Do lack of identification and carrying drugs go together? We may assume so, although no expert testimony was presented on the subject, and none of the officers testified about it from their experience. Gibson's story about the funeral may have seemed suspicious in light of the dirty casual clothing in his bag, but here again this adds little to the probability that he was carrying drugs or committing some other crime. The proposition to which this evidence relates, we assume, is that drug couriers travelling from a source city are likely to make up stories about what they were doing there. The record does not establish this proposition, but we are willing to accept it. How likely was it that Gibson made up the story about the funeral? That depends on several other propositions about which we have no information and neither did the officers. How often do people attend funerals in casual clothing? Would the type of funeral matter? If more formal attire was the norm, how likely was it that Cook borrowed clothing from someone else?

 Up to this point, the likelihood that Gibson had committed a crime "was low, much too low to have satisfied the Fourth Amendment in light of the interests it protects." *United States v. Prandy–Binett,* 995 F.2d 1069, 1071 (D.C.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1196, 127 L.Ed.2d 545 (1994). The most that can be said is that to an experienced narcotics officer Gibson was suspicious. Probable cause lies somewhere beyond bare suspicion. 995 F.2d at 1070. Cook's discovery, during the pat down, of a "hard," "flat," "angular" object in Gibson's left pants pocket does not sufficiently enhance the probabilities. A touch may reveal enough information to provide probable cause. *Minnesota v. Dickerson,* —— U.S. ——, —— & n. 4, 113 S.Ct. 2130, 2137 & n. 4, 124 L.Ed.2d 334 (1993); *United States v. Williams,* 822 F.2d 1174, 1184–85 (D.C.Cir.1987). But not in this case. Cook testified that the object did not feel like anything a person might normally carry in his pocket.* He did not testify how often he had encountered such an object during a pat down, and he related nothing from his experience to correlate objects of this sort with criminal activity. *Contrast Prandy–Binett,* 995 F.2d at 1071–72. The government at oral argument had considerable difficulty explaining how a hard, flat, angular object in someone's pocket would lead a law enforcement officer of reasonable caution to believe an offense had been or is being committed. A flat angular object does not correspond with rocklike crack cocaine, or the twigs and leaves of marijuana, or capsules containing prescription drugs. *See Williams,* 822 F.2d at 1177, 1186 & n. 121. There is no indication Cook thought the object was a weapon.

---

* It is not clear whether the hard, flat, angular object Cook felt was the package of drugs he discovered on Gibson. Gibson testified that he had rolled up his change in several bills and that this is what he had in his left pocket.

■ All that remains is Gibson's answer to Cook's inquiry about the object. Gibson said, in an apparently nonresponsive but truthful reply, he had on a second pair of pants. Like a reply such as "None of your business," this may have been enough to indicate that Gibson had something to hide. But even with his training and experience, Cook could not tell what the something might be. The Fourth Amendment stands in the way of the police arresting people simply because they appear suspicious and may be hiding something. The case is remanded with instructions that the evidence seized as a result of Gibson's illegal arrest be suppressed.

*So ordered.*