STATE OF NEBRASKA, APPELLANT, V. CLINT WALKER WILEN, APPELLEE.

539 N.W.2d 650

Filed November 7, 1995. No. A-95-236.

134

Charles J. Stolz, Deputy Sarpy County Attorney, for appellant.

Michael B. Kratville, of Terry & Kratville Law Offices, for appellee.

HANNON, IRWIN, and MILLER-LERMAN, Judges.

MILLER-LERMAN, Judge.

Appellee, Clint Walker Wilen, was charged in the district court for Sarpy County with attempted second degree assault on a police officer. See Neb. Rev. Stat. § 28–930 (Reissue 1989). After the State presented its case against Wilen to the jury, the trial court sustained Wilen's motion for directed verdict and dismissed the charges against Wilen for lack of evidence. This court granted the application of the county attorney to docket the proceedings for review by this court as authorized by Neb. Rev. Stat. § 29–2315.01 (Cum. Supp. 1994). The State assigns one error in this appeal, which we address in part III of this opinion entitled "Analysis of Challenged Ruling." For the reasons recited below, we sustain the State's exception. Because jeopardy had attached and terminated at trial, our ruling sustaining the State's exception does not permit a reversal.

## I. FACTUAL BACKGROUND

On the evening of November 25, 1994, Officer Melanie Whitney, a duly sworn law enforcement officer with the Bellevue Police Department, was working in a secondary employment capacity at the Hardee's restaurant located at 1701 Galvin Road South in Bellevue. This particular Hardee's restaurant had been experiencing problems with fights and with individuals carrying guns and knives on its property. Consequently, Hardee's hired Officer Whitney and other Bellevue police officers to work at the restaurant on the weekends for purposes of maintaining the peace and providing security and protection for its patrons. Officer Whitney received compensation from Hardee's for her services in addition to her regular salary as a Bellevue police officer. Officer Whitney engaged in this secondary employment during hours that she was not regularly scheduled as an "on–duty" officer for the Bellevue Police Department. In accord with her peacekeeping purpose at Hardee's, Officer Whitney dressed in her official police uniform and carried a sidearm, her police badge, and a police radio.

At approximately 9:30 p.m. on November 25, Officer Whitney was inside the Hardee's restaurant when she heard

someone cursing loudly over the intercom of the drive-through window. With the assistance of the individual working at the drive-through window, Officer Whitney identified the car in which the individual who was swearing was riding, went outside, and approached the passenger side of the vehicle. The vehicle, described by Officer Whitney as a "newer model Cavalier," held a female driver and two male passengers, one in the backseat and the other in the front passenger seat. When Officer Whitney reached the passenger side of the vehicle, she asked the individuals which one of them had been "cussing" into the drive-through intercom. The individual in the front passenger seat indicated that he was that individual and stepped out of the car at Officer Whitney's request.

Officer Whitney testified that the individual, who identified himself as Clint Wilen, "got very smart with me" and that he smelled of alcohol. Officer Whitney stated that Wilen gave her his name and date of birth, but told her he did not have any identification with him. At Officer Whitney's direction to leave the premises, Wilen got back in the car, and the car exited the Hardee's parking lot.

Later that night, Officer Whitney had another confrontation with Wilen which directly gives rise to the instant case. The individual working at the drive-through window at about 12:40 a.m. on November 26 summoned Officer Whitney, who was working on the other side of the restaurant, and informed her that a collision had occurred between two cars in the drive-through lane. Officer Whitney went outside to investigate the accident and discovered that the Jeep Cherokee positioned at the drive-through window had been hit from behind by a silver Volvo.

First, Officer Whitney made contact with the driver of the Jeep, Jamie Loefler. Officer Whitney determined that Loefler was not injured, inspected Loefler's Jeep for damage, and then asked Loefler for her driver's license, registration, and proof of insurance. While Loefler was retrieving the requested items, Officer Whitney approached the driver of the Volvo, later identified as Wilen. Officer Whitney testified that she did not immediately realize the driver of the Volvo was Wilen because his appearance seemed different than she remembered from

their confrontation earlier that night. According to Officer Whitney's testimony, when she asked Wilen for his driver's license, registration, and proof of insurance, "[a]ll he did was stare at [her]." Officer Whitney testified that she explained to Wilen that there was damage to the Volvo and that she needed to complete a report on the accident. See Neb. Rev. Stat. § 60-695 (Reissue 1993) (providing generally that a peace officer who investigates a traffic accident has a duty to file a report of any accident resulting in personal injury, death, or property damage in excess of a statutory amount). Wilen remained unresponsive. Officer Whitney also noted that Wilen smelled strongly of alcohol and that his eyes were watery and bloodshot.

At that point, Officer Whitney proceeded to the front of the Volvo, with her police radio in hand, intending to "run the plate" of the Volvo. After squeezing between the Jeep and the Volvo, she attempted to get the identification of the passenger in the Volvo. Officer Whitney testified that she hesitated for a second and, out of the corner of her eye, saw "the car doing something. . . . [M]oving." Officer Whitney stated that she turned toward the Volvo, saw it reverse a few feet, and "then I [saw] headlights coming at me, and Wilen is looking right at me and then starts to look down and just floors it . . . ." The Volvo sped out of the Hardee's lot. In describing what she meant by "[he] floors it," Officer Whitney testified that the Volvo took off very fast, sending the gravel on the pavement "flying every which way." Officer Whitney testified specifically that if she had not stepped back out of the Volvo's path it would have hit her.

Kristi Wright, a Hardee's employee who witnessed the incident, testified at trial and corroborated Officer Whitney's description of the facts surrounding the attempted assault. Wright testified that it appeared that Officer Whitney had to "scoot back" to avoid being hit by the Volvo. When asked on cross-examination if it appeared Wilen tried to hit Officer Whitney, Wright speculated that "I wouldn't think he tried to on purpose, no."

After the incident, Officer Whitney was unable to follow the Volvo when it turned out of the Hardee's parking lot, as she was

on foot. Later that night, however, the Volvo was stopped by another officer for reasons not specified in the record. Officer Whitney positively identified Wilen as the driver of the Volvo with whom she had had the incident earlier that night.

Wilen was subsequently charged with attempted second degree assault on a police officer. See § 28-930. The information charged that the crime was "intentionally or knowingly or recklessly" committed. Wilen pled not guilty to the attempted assault charge, and the case proceeded to trial. A jury trial of this matter was conducted on February 15, 1995. The State offered the testimony of Officer Whitney and Wright and then rested its case. After the State rested, Wilen moved for a directed verdict, arguing that the State had not proved the intentional element of the charged offense. We note that this case was tried before the decision of this court in *State v. Hemmer*, 3 Neb. App. 769, 531 N.W.2d 559 (1995), was filed on May 23, 1995, in which we held that attempted reckless assault on a peace officer in the second degree is not a crime in Nebraska. After hearing argument from the parties, the district court granted Wilen's motion on other grounds and dismissed the case. Specifically, the district court found that the State presented "no evidence to support" the fact that Officer Whitney, who is a peace officer, was engaged in her official duties at the time of the incident.

On February 27, 1995, the State moved for leave to docket an appeal to this court pursuant to § 29-2315.01. We granted the State's motion for purposes of clarifying when an officer is "engaged in the performance of his or her official duties" for purposes of § 28-930.

## II. SCOPE AND PURPOSE OF REVIEW
## IN AN ERROR PROCEEDING

■ This appeal is before this court as an error proceeding filed by a county attorney pursuant to § 29-2315.01, which states in part: "The county attorney may take exception to any ruling or decision of the court made during the prosecution of a cause by presenting to the trial court the application for leave to docket an appeal with reference to the rulings or decisions of which complaint is made." Neb. Rev. Stat. § 29-2316 (Cum.

Supp. 1994) defines the scope and purpose of our review in error proceedings. According to the cases, the purpose of such review "is to provide an authoritative exposition of the law for use as a precedent in similar cases which may now be pending or which may subsequently arise." *State v. Jennings*, 195 Neb. 434, 436, 238 N.W.2d 477, 479 (1976). Accord *State v. Vaida*, 1 Neb. App. 768, 510 N.W.2d 389 (1993).

### III. ANALYSIS OF CHALLENGED RULING

#### 1. IDENTIFICATION OF ISSUE ON APPEAL

In this appeal, the State asks us to determine the propriety of the district court's order granting Wilen's motion for directed verdict for the reason that the State failed to present evidence that peace officer Whitney was engaged in the performance of her official duties at the time of the alleged attempted assault. Wilen was charged with attempted assault on an officer in the second degree, a Class IV felony. See § 28–930. Section 28–930 provides in part:

A person commits the offense of assault on an officer in the second degree if he or she:

(a) Intentionally or knowingly causes bodily injury with a dangerous instrument to a peace officer or employee of the Department of Correctional Services while such officer or employee is engaged in the performance of his or her official duties; or

(b) Recklessly causes bodily injury with a dangerous instrument to a peace officer or employee of the Department of Correctional Services while such officer or employee is engaged in the performance of his or her official duties.

Neb. Rev. Stat. § 28–201 (Reissue 1989) makes it a crime to attempt to commit such a felony. The element of § 28–930 at issue in this proceeding is the requirement that the peace officer–victim be "engaged in the performance of his or her official duties" at the time of the incident. Specifically, the question before this court is whether, under the facts of this case, Officer Whitney, whom the record clearly shows was a peace officer at the time in question, was performing her official duties at the time Wilen allegedly attempted to commit the

assault as charged.

## 2. STANDARD OF REVIEW

■ Statutory interpretation involves the resolution of a question of law, regarding which an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *State v. Dake*, 247 Neb. 579, 529 N.W.2d 46 (1995).

■ In interpreting the meaning of § 28–930, we note that a statute is open to construction when its language requires interpretation or may reasonably be considered ambiguous. *State v. Joubert*, 246 Neb. 287, 518 N.W.2d 887 (1994). Although a penal statute must be strictly construed, it is to be given a sensible construction, and general terms are to be limited in their construction and application so as to avoid injustice, oppression, or an absurd consequence. *Id*. We note that in construing statutes, an appellate court must seek to effect the legislative intent of the statute which may be discerned from the entire language of the statute considered in its plain, ordinary, and popular sense. *State v. Cox*, 247 Neb. 729, 529 N.W.2d 795 (1995).

## 3. APPLICABLE ANALYSIS

The trial court found that the State presented no evidence that Officer Whitney was engaged in the performance of her official duties at the time of the alleged attempted assault. Specifically, it appears the trial court was persuaded that because Officer Whitney was working in the capacity of her secondary employment with Hardee's that she could not be engaged in the performance of "official duties" for purposes of § 28–930 at the time of the incident. We disagree.

■ Although the question of performance of official duties under § 28–930 while engaged in secondary employment under the facts of this case appears not to have been addressed in Nebraska, many other jurisdictions have concluded in factually similar cases that police officers moonlighting for private employers as security guards or similar peacekeepers are engaged in official duties for purposes of officer assault statutes or statutes defining aggravating circumstances when, during the course of such secondary employment, they react to incidents of

what may be criminal or disorderly conduct. *State v. Gaines*, 332 N.C. 461, 421 S.E.2d 569 (1992); *State v. Hartzog*, 575 So. 2d 1328 (Fla. App. 1991); *Duncan v. State*, 163 Ga. App. 148, 294 S.E.2d 365 (1982); *Tapp v. State*, 406 N.E.2d 296 (Ind. App. 1980); *People v. Barrett*, 54 Ill. App. 3d 994, 370 N.E.2d 247 (1977). In each of the foregoing cases, the court analyzed the issue of the performance of "official duties" under a test which examined the nature of the secondary employment and the nature of the acts being performed at the time of the incident. We are persuaded from our review of relevant case law that an examination of the nature of the acts the officer is performing at the time of the incident as well as the circumstances surrounding those acts and the secondary employment is a well-reasoned analytical approach to the issues in this case. Therefore, in the instant case, we examine (1) the specific nature, extent, and circumstances of the secondary employment; (2) the manner in which such secondary employment is regarded by the employer and employee; and (3) the nature of the acts the peace officer-victim is performing at the time in question.

### 4. APPLICATION AND DISCUSSION

#### (a) Specific Nature, Extent, and Circumstances of Secondary Employment

*(i) Primary Employment and Off-Duty Conduct Generally*

To assess the nature of Officer Whitney's secondary employment with Hardee's, it is necessary to put such employment in context by examining the general nature of Officer Whitney's employment as a police officer. Thus, we identify generally duties of police officers under the relevant common law, case law, and statutes.

Under the common law as reflected in the treatises and cases, a police officer has certain powers, rights, and duties both on and off duty. In connection with off-duty obligations, it has been stated:

A police officer on "off-duty" status is nevertheless not relieved of the obligation as an officer to preserve the public peace and to protect the lives and property of the

citizens of the public in general. Indeed, police officers are considered to be under a duty to respond as police officers 24 hours a day.

16A Eugene McQuillin et al., The Law of Municipal Corporations § 45.15 at 123 (3d ed. 1992). Under the cases, based both on common law and statute, it has been widely held that a police officer is not relieved of his or her obligation to preserve the peace while off duty. See, e.g., *Gibson v. State*, 316 Ark. 705, 875 S.W.2d 58 (1994); *Harris v. City of Colorado Springs*, 867 P.2d 217 (Colo. App. 1993); *Packard v. Rockford Prof. Baseball Club*, 244 Ill. App. 3d 643, 613 N.E.2d 321 (1993); *Animashaun v. State*, 207 Ga. App. 156, 427 S.E.2d 532 (1993); *Tate v. State*, 198 Ga. App. 276, 401 S.E.2d 549 (1991); *Firemen's and Policemen's Civ. Serv. v. Burnham*, 715 S.W.2d 809 (Tex. App. 1986); *Alvarado v. City of Dodge City*, 10 Kan. App. 2d 363, 702 P.2d 935 (1985), *rev'd in part on other grounds* 238 Kan. 48, 708 P.2d 174.

█ In Nebraska, it has long been the case that a police officer may provide security to a commercial establishment while off duty and make arrests or take other authoritative action in connection therewith. See, e.g., *State v. Groves*, 219 Neb. 382, 363 N.W.2d 507 (1985) (acknowledging official police officer status of off–duty officer serving as security guard who arrested defendant for disorderly conduct); *State v. Munn*, 203 Neb. 810, 280 N.W.2d 649 (1979) (approving arrest of defendant for robbery made by off–duty police officer serving as security guard at bus depot); *State v. Williams*, 203 Neb. 649, 279 N.W.2d 847 (1979) (approving authoritative action by off–duty police officer working at bus depot).

█ Under the Nebraska cases, a police officer's conduct while off duty can implicate his or her official position, and a police officer is subject to rules that regulate his or her conduct on and off duty, whether in or out of uniform. See, e.g., *In re Appeal of Bonnett*, 216 Neb. 587, 344 N.W.2d 657 (1984) (approving official personnel action by Blair Police Department taken against officer who accidentally fired his police weapon while off duty and failed to report incident); *Richardson v. City of Omaha*, 214 Neb. 97, 333 N.W.2d 656 (1983) (approving dismissal of police officer based on violations of rules of

conduct due to allegations of criminal business practices occurring while off duty).

We recognize that despite personnel manuals that impose certain affirmative duties on a police officer while off duty, certain off–duty activities are unrelated to police officer status or do not resemble the police officer's obligation to keep the peace, and such off–duty conduct is not viewed as engaging in the performance of official duties. See, e.g., *Baughman v. City of Omaha*, 142 Neb. 663, 7 N.W.2d 365 (1943) (holding that police officer accidentally killed by passing car while crossing street on his way home after work was not killed in the course of his employment for purposes of workers' compensation). We also note that under *Salyers v. State*, 159 Neb. 235, 66 N.W.2d 576 (1954), where the victim of a beating after a night of drinking happened to be a police officer, the charge against the defendant according to the opinion was limited to assault and battery, not assault on an officer.

We are aware that in the context of the Fourth Amendment, the Nebraska Supreme Court has stated that it has "reject[ed] the notion that solely because one is a police officer, the officer acts in that capacity at all times." *State v. Walker*, 236 Neb. 155, 161, 459 N.W.2d 527, 532 (1990) (upholding admission of evidence based on search of leased residence by off–duty law enforcement officer where officer observed contraband in residence in his capacity as private citizen–landlord, not as agent of State). This statement indicates that the Nebraska Supreme Court has rejected the idea that solely because one is a police officer he or she always acts in his or her official capacity. Neither *Walker* nor the Nebraska cases discussed above preclude the scenario where an off–duty law enforcement officer witnesses misconduct and the officer engaged in peacekeeping is, therefore, under the circumstances, deemed to be engaged in the performance of his or her official duties.

We note that Nebraska statutes describe generally the duties of a police officer such as Officer Whitney. The city of Bellevue is a city of the first class under Neb. Rev. Stat. § 16–101 (Cum. Supp. 1994). Under Neb. Rev. Stat. § 16–323 (Reissue 1991),

police officers [of cities of the first class] shall have the

power and the duty to arrest all offenders against the laws of the state or of the city, by day or by night, in the same manner as a sheriff . . . . [P]olice officers shall have the same power as the sheriff in relation to all criminal matters arising out of a violation of a city ordinance . . . .

 Section 16–323 does not distinguish between the authority and obligations of police officers on or off duty or in or out of uniform. However, by its language, § 16–323 provides that the powers and duties it confers shall be exercised upon "all offenders . . . by day or by night." One can infer from the statutory language that police officers in Bellevue may, under proper circumstances, exercise their authority and peacekeeping duties at any time. This statute is compatible with the notion that police officers are expected to exercise their obligations, regardless of whether they are officially on duty. Based on the foregoing, we conclude that Nebraska law does not conflict with the common–law view to which we subscribe that under proper circumstances, police officers have a duty to preserve the peace and to respond as police officers at all times.

### (ii) Secondary Employment

 Our analysis of the foregoing statutory and common law indicates that a police officer retains his or her police officer status, even while off duty in a secondary employment capacity, unless it is clear from the nature of the officer's activities that he or she is acting exclusively in a private capacity or is engaging in his or her own private business. Based on public policy reasons, other jurisdictions have adopted this view. It has been stated:

> The practice of municipalities which allows law enforcement officers, while off duty and in uniform, to serve as peace–keepers in private establishments open to the general public is in the public interest. The presence of uniformed officers in places susceptible to breaches of the peace deters unlawful acts and conduct by patrons in those places. The public knows the uniform and the badge stand for the authority of the government. The public generally knows that law enforcement officers have the duty to serve and protect them at all times. A holding that

law enforcement officers have no official duty to maintain the peace under these circumstances would be in contravention of the policy we seek to further.

*Duncan v. State*, 163 Ga. App. 148, 149, 294 S.E.2d 365, 366–67 (1982). In this regard, the U.S. Supreme Court has described police officers as "trustee[s] of the public interest." *Gardner v. Broderick*, 392 U.S. 273, 277, 88 S. Ct. 1913, 20 L. Ed. 2d 1082 (1968).

We find the quoted language from *Duncan v. State, supra*, particularly relevant in this case. Hardee's, a restaurant open to the general public, hired Officer Whitney and other Bellevue police officers to curtail disorderly and unlawful conduct and to provide security to the restaurant and its patrons. The functions Officer Whitney performed for Hardee's, in general and on the evening in question, are consistent with the powers and duties of her primary employment as a law enforcement officer for the city of Bellevue.

When Officer Whitney worked at Hardee's, she was armed and dressed in her full police uniform and badge. Her uniformed status indicated that her secondary employment was consistent with the tenets of the Bellevue Police Department. A uniformed individual at the restaurant conveyed to the patrons the presence of law enforcement. Under the cases, an official uniform implies an official status, and a defendant will be charged with knowledge of the uniformed officer's official status where circumstances warrant. See, *Chandler v. State*, 204 Ga. App. 816, 421 S.E.2d 288 (1992) (inferring knowledge of police officer's official status when defendant observed police officer in official uniform); *State v. Brown*, 36 Wash. App. 166, 672 P.2d 1268 (1983) (holding that disclosure of police officer status may be nonverbal by use of uniform or badge). The public expects that a uniformed law enforcement officer has the power to enforce the law and to arrest where necessary, powers which a private security guard generally does not possess.

Pursuant to the foregoing analysis, we conclude that in performing her duties at Hardee's, Officer Whitney (1) acted on behalf of both Hardee's and the general public and (2) was responding to the events in question in her official capacity as a law enforcement officer.

### (b) Manner In Which Employer and Employee Regard Secondary Employment

It is clear that Officer Whitney performed duties for Hardee's that were supplemental to her primary duties of law enforcement on behalf of the general public. The fact that Officer Whitney received compensation from Hardee's, along with her salary from public employment, is of no consequence. Pursuant to her primary employment with the city of Bellevue, her ultimate duty was to enforce the law and ensure the safety of the public at large. The record suggests that Hardee's hired Officer Whitney and other police officers on the basis of their official status and the advantages this status would provide in their peacekeeping function. While Officer Whitney's primary official status and secondary services benefited Hardee's, her goal always was to keep the peace, universally regarded as an official law enforcement duty.

### (c) Nature of Acts Performed at Time in Question

On the night in question, Officer Whitney had two confrontations with Wilen. In the first instance, Officer Whitney heard Wilen swearing into the intercom of the drive–through window. Officer Whitney responded to Wilen's disorderly conduct by identifying him, confronting him, and directing him to leave the property. Against Officer Whitney's directions, Wilen returned to Hardee's a few hours later driving a silver Volvo and caused it to collide with another vehicle in the drive–through lane, causing property damage. Officer Whitney responded by investigating the circumstances of the accident, and she attempted to complete an official accident report.

The record reflects that Officer Whitney responded to and investigated the accident in an official and professional manner. Officer Whitney testified in detail regarding her observations of Wilen and his possible state of intoxication. This testimony was comparable to that of police officers in criminal drunk driving cases generally. Before Officer Whitney could resolve the issue of Wilen's state of intoxication or complete a report of the accident, Wilen backed up the Volvo and sped out of the parking lot onto a public road, the Volvo missing Officer Whitney only because she stepped out of the way.

## (d) Summary of Analysis

Statutes recognizing that law enforcement officials are exposed to greater risks of assault and battery are widespread. See *Tapp v. State*, 406 N.E.2d 296 (Ind. App. 1980) (statutes and cases collected). Section 28–930 recognizes that law enforcement officers in Nebraska are exposed to harm due to the nature of their official duties. As indicated above, the performance of official duties may arise at any time. Under the facts of this case, at the time of the alleged attempted assault, Officer Whitney was engaged in the performance of her official duties within the meaning of § 28–930. This conclusion is consistent with the dictates of statutory interpretation, which direct us to effect the obvious legislative intent and purpose of the statute prohibiting an assault on an officer. See *State v. Cox*, 247 Neb. 729, 529 N.W.2d 795 (1995). To fail to hold that Officer Whitney was performing her official duties at the time of the alleged attempted assault would be inconsistent with public policy, the cases, and the intent of the statute under which Wilen was charged. Based on the foregoing, we conclude that the trial court erred in sustaining Wilen's motion for directed verdict on the basis that the State presented no evidence that Officer Whitney was performing her official duties at the time of the alleged attempted assault.

## IV. EFFECT OF THIS RULING

As explained above, this is an appeal by a county attorney pursuant to § 29–2315.01. Section 29–2316 describes the effect of the appellate court's ruling pursuant to § 29–2315.01:

The judgment of the court in any action taken pursuant to section 29–2315.01 shall not be reversed nor in any manner affected when the defendant in the trial court has been placed legally in jeopardy, but in such cases the decision of the appellate court shall determine the law to govern in any similar case which may be pending at the time the decision is rendered or which may thereafter arise in the state. When the decision of the appellate court establishes that the final order of the trial court was erroneous and the defendant had not been placed legally in jeopardy prior to the entry of such erroneous order, the

trial court may upon application of the county attorney issue its warrant for the rearrest of the defendant and the cause against him or her shall thereupon proceed in accordance with the law as determined by the decision of the appellate court.

Having concluded that the trial court erred in directing a verdict against the State and dismissing the case, pursuant to § 29-2316 we must determine whether jeopardy had attached before the trial court dismissed the case.

 The Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution and of article I, § 12, of the Nebraska Constitution protects " 'an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.' " *State v. Bostwick*, 222 Neb. 631, 642, 385 N.W.2d 906, 914 (1986) (quoting *Green v. United States*, 355 U.S. 184, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957)). Although jeopardy attaches when a jury is impaneled and sworn, the Double Jeopardy Clause bars retrial in criminal prosecutions only where jeopardy has attached and terminated. *State v. Bostwick, supra.* Events which terminate jeopardy include (1) an acquittal by a judge or jury, (2) a directed verdict of acquittal for insufficient evidence, and (3) a conviction reversed as a matter of law for insufficient evidence. *Id.*

 In *Smalis v. Pennsylvania*, 476 U.S. 140, 106 S. Ct. 1745, 90 L. Ed. 2d 116 (1986), a case procedurally similar to the instant case, the U.S. Supreme Court determined that a dismissal at the end of the State's case constituted an acquittal for double jeopardy purposes. Specifically, the Court held in *Smalis* that a demurrer sustained on the basis that the State's evidence was insufficient to establish factual guilt constituted an acquittal under the Double Jeopardy Clause, barring the State's postacquittal appeal when reversal could result in a second trial or further proceedings for the purpose of resolving factual issues relating to the elements of the charged crime. Accordingly, under *Smalis v. Pennsylvania, supra*, we find in the instant case that the directed verdict constituted an acquittal and that jeopardy had attached and terminated. Therefore, under § 29-2316, our decision herein does not reverse or affect the district court's judgment.

## V. CONCLUSION

We conclude that the trial court erred in sustaining Wilen's motion for directed verdict and, therefore, sustain the State's exception. Because jeopardy had attached and terminated at the time the trial court dismissed the case, our decision does not reverse or affect the judgment of the trial court, but provides "an authoritative exposition of the law for use as a precedent in similar cases which may now be pending or which may subsequently arise," *State v. Jennings*, 195 Neb. 434, 436, 238 N.W.2d 477, 479 (1976), with reference to the meaning of the phrase "engaged in the performance of his or her official duties" as used in § 28–930.

EXCEPTION SUSTAINED.