782 N.W.2d 913 (2010)
279 Neb. 918
STATE of Nebraska, appellee,
v.
William E. SMITH, appellant.
No. S-09-375.
Supreme Court of Nebraska.
May 28, 2010.
*919 Kevin J. Oursland, Lincoln, for appellant.
Jon Bruning, Attorney General, and Nathan A. Liss for appellee.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

I. NATURE OF CASE
William E. Smith appeals his conviction for possession of a controlled substance with intent to deliver. Smith argues that the district court erred in denying his motion to suppress evidence of illegal drugs that was discovered in his pocket during a pat-down search outside a nightclub. There are two issues presented in this appeal: whether the evidence obtained was the product of a search within the meaning of the Fourth Amendment and, if so, whether the search was reasonable under the Fourth Amendment.

II. BACKGROUND
We have examined the record and find no clear error in the historical factual findings of the district court,[1] nor does either party take issue with the court's factual findings. The pertinent historical facts are as follows.
Force Protection Services, a private security company owned and operated by Joseph South, provided security outside the Manhattan Club (the Club), a dance club in Omaha, Nebraska. Pursuant to a contract with the Club, Force Protection Services was to conduct a pat-down search of every patron for narcotics or weapons before they entered the Club. At the entrance of the Club is a sign stating that patrons are subject to a pat down and search. It is not uncommon for people in line, who observe the pat down, to get out of line and go back to their car. In addition to Force Protection Services, supplemental police officers are present, pursuant to an agreement with the Club.
On the night of the arrest, the Club was featuring the performance of a local diskjockey, and South and Calvin Harper, a uniformed and armed off-duty police officer, were providing security outside the Club. Smith and his cousin walked up to the Club's entrance. After Smith's cousin was patted down and permitted entry, he turned to Smith and said, "[S]orry, I forgot they pat down." South started to pat down Smith and felt a bulge in Smith's left front pocket.
South started to place his hand toward Smith's pocket and asked Smith twice what was in his front pocket, but Smith did not answer. Smith grabbed South's wrist to prevent South from reaching into his pocket. South instructed Smith to keep his hands in the air. South reached for Smith's pocket again, and again, Smith *920 pushed South's hand away. Harper intervened at that point and told Smith to keep his hands in the air. Harper placed his arm under Smith's wrist, and South reached into Smith's pocket. South pulled out three cellophane bags containing pills that appeared to be "MDMA," also known as Ecstasy, a Schedule I controlled substance.[2] South handed the bags to Harper, who completed the search and arrested Smith.
The State filed an information charging Smith with possession of a controlled substance with intent to deliver.[3] Smith filed a motion to suppress alleging that he was unlawfully searched and arrested in violation of the U.S. and Nebraska Constitutions. After a hearing, the district court denied Smith's motion to suppress, and thereafter, a bench trial based on the stipulated facts was held. Smith renewed the objections raised in his motion to suppress. The district court found Smith guilty of possession of a controlled substance with intent to deliver and sentenced him to 3 to 5 years' imprisonment. Smith appeals.

III. ASSIGNMENT OF ERROR
Smith assigns that the district court erred in finding the warrantless search was reasonable.

IV. STANDARD OF REVIEW
In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review.[4] Regarding historical facts, we review the trial court's findings for clear error.[5] But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[6]

V. ANALYSIS
The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable search and seizure.[7] We note that we have not construed article I, § 7, of the Nebraska Constitution to provide greater rights than those afforded a defendant by the Fourth Amendment.[8] Smith argues that in this case, the district court erred in finding that the search was reasonable. Before we address the reasonableness of the search, however, we must address whether the search came under the purview of the Fourth Amendment or article I, § 7. The State claims it did not.

1. SMITH WAS SEARCHED WITHIN MEANING OF FOURTH AMENDMENT
The State's primary argument is that Smith was searched by South, a private actor, not the government. But as a threshold matter, we first consider the State's argument that the Fourth Amendment is not implicated because Smith was not "searched" or "seized." We agree with the district court's conclusion that Smith was searched.
To determine whether an individual has an interest protected by the Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7, we must determine whether the individual has a legitimate or *921 justifiable expectation of privacy in the invaded place. Ordinarily, two inquiries are required. First, the individual must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable.[9]
For reasons that will be explained more fully below with respect to consent, Smith clearly exhibited an actual expectation of privacy. The State seems to be arguing that because Smith knew the Club patted down patrons, his expectation of privacy was unreasonable. But whether an expectation of privacy is reasonable does not turn on notice.[10] Rather, an expectation of privacy is reasonable if it has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.[11]
We have little difficulty in concluding that Smith's expectation that the contents of his pockets were private was reasonable and that the invasion of that privacy was a search. Generally speaking, courts have implicitly assumed that an individual has a reasonable expectation of privacy with respect to those portions of his or her person that are hidden from public view, including hidden recesses in both one's clothing and body.[12] For example, rummaging through an individual's pockets and other inner recesses of one's clothing constitutes a Fourth Amendment search of the person.[13] Likewise, patting down an individual's outer clothing so as to discover hidden objects therein is also a Fourth Amendment search.[14] In this case, the evidence in question was retrieved from a location hidden from public view, namely Smith's pocket. Such a search is unquestionably a Fourth Amendment search.

2. SEARCH OF SMITH WAS GOVERNMENT SEARCH
Having concluded that a search took place, we turn next to whether the search was a government search. The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.[15] The constitutional protection against an unreasonable search and seizure proscribes only governmental action and is inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official.[16] But a search is subject to the constitutional safe-guard against an unreasonable search if the search is a joint endeavor involving a private person and a state or government official.[17]
*922 In determining what is a joint endeavor between a private person and a government official, it is not essential that the government official be involved in the endeavor at the very outset.[18] In fact, it is "`immaterial'" whether the government official originated the idea or joined in it while the search was in progress.[19] It is sufficient that the official "`was in it before the object of the search was completely accomplished.'"[20] The government may become party to a search through nothing more than tacit approval.[21] In this case, the State argues that the search was not a joint endeavor between South and the government. Essentially, the State asserts that Harper's actions were a matter of preserving the peace, not a participation in the search of Smith. The facts lead us to conclude otherwise.
The question whether a search is a private search or a government search is one that must be answered taking into consideration the totality of the circumstances.[22] On the record before us, it is clear that the search of Smith was a joint endeavor involving a private person and a state or governmental official. First, we conclude that Harper, although off duty at the time, was acting as a governmental official in his capacity as a police officer. A police officer on "off-duty" status is obligated to preserve the public peace and to protect the lives and property of the public in general.[23] Police officers are considered to be under a duty to respond as police officers 24 hours a day.[24] It has been widely held, based both on common law and statute, that a police officer is not relieved of his or her obligation to preserve the peace while off duty.[25] In Nebraska, it has long been the case that a police officer may provide security to a commercial establishment while off duty and make arrests or take other authoritative action in connection therewith.[26] At the time of the search, Harper was in full police uniform and was carrying a firearm. Although Harper was off duty and employed by the Club, he was acting in his official capacity as a police officer, not as a private citizen.
And the search was a joint endeavor between Harper and South. After South started the pat-down search of Smith and attempted to reach into Smith's pocket, Harper directed his attention to the pat down and reminded Smith to keep his hands in the air. Harper also testified that he reached out his arm and placed his wrist under Smith's arm in order to keep Smith's arm raised. Harper placed *923 his wrist under Smith's arm before South inserted his hand into Smith's pocket. Harper was clearly involved in the search before the object of the search was completely accomplished. It is without question that Harper's involvementby directing Smith to hold his hands up and by placing his arm underneath Smith's wrist to prevent him from interfering with Southwas more than tacit approval.
Taking all of these circumstances into account, we conclude that Smith established that the search meets the test for a government search. The totality of the facts shows that Harper and South were engaged in a joint endeavor.

3. SEARCH OF SMITH WAS NOT REASONABLE
The remaining question is whether the search was reasonable. The Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7, prohibit only unreasonable searches and seizures.[27] These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions.[28] Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.[29] The warrantless search exceptions recognized by this court include searches undertaken with consent, searches justified by probable cause, searches under exigent circumstances, inventory searches, searches of evidence in plain view, and searches incident to a valid arrest.[30] In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement.[31]

(a) There Was No Probable Cause to Search Smith
In this case, the only warrantless search exceptions that are potentially applicable are for searches undertaken with consent or with probable cause. First, we consider whether there was probable cause for the search. Probable cause escapes precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.[32] Probable cause is a flexible, commonsense standard. It merely requires that the facts available to the officer would warrant a person of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.[33] We determine probable cause by an objective standard of reasonableness, given the known facts and circumstances.[34]
The facts and circumstances here are not sufficient to warrant a belief that evidence of a crime would be found in Smith's pocket. We note that the search at issue occurred when South reached into Smith's pocketnot South's initial pat down. Smith argues that even after the pat down, there was no probable cause to extend the search into Smith's pocket. *924 We agree. Under the "plain feel" doctrine, the findings of a lawful pat down can establish probable cause to extend the scope of a search.[35] But the legality of the search depends upon the incriminating character of an object being immediately apparent,[36] and in this case, it was not.
In Minnesota v. Dickerson,[37] the U.S. Supreme Court held that an officer may make a warrantless seizure of contraband detected during a lawful pat-down search. The Court reached this conclusion by drawing an analogy to the previously recognized "plain-view" doctrine, which permits police officers to seize an object without a warrant if they are lawfully in a position from which they can view the object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object.[38] The Court explained:
The same can be said of tactile discoveries of contraband. If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.[39]
When we adopted the "plain feel" doctrine in State v. Craven,[40] we examined two cases from the District of Columbia Circuit Court of Appeals that help illustrate the doctrine's principles. In U.S. v. Gibson,[41] the court held that an officer who felt a hard, flat, angular object in a suspect's pocket during a pat down did not have probable cause for an extended search which revealed cocaine in a second pair of trousers worn by the suspect. The officer testified that the object he touched "did not feel like anything a person might normally carry in his pocket,"[42] but did not relate anything from his experience to correlate such an object to criminal activity. Noting the government's difficulty in "explaining how a hard, flat, angular object in someone's pocket would lead a law enforcement officer of reasonable caution to believe an offense had been or is being committed,"[43] the court stated that such an object did not resemble contraband and that thus, its detection did not provide probable cause to extend the search. By contrast, in U.S. v. Ashley,[44] the same court held that probable cause for seizure of drugs from a suspect's underwear existed where an officer experienced in the packaging and transportation of narcotics testified that when he felt a hard object under the suspect's trousers while patting down his groin area, he immediately associated the object with crack cocaine even though he was not absolutely certain that the object was cocaine until conducting a more invasive search.
The facts of this case resemble those of Gibson far more closely than those of Ashley. *925 In this case, when South was performing the search, he "felt something suspicious" in Smith's pocket, and Smith twice failed to answer South's question about the contents of his pocket. Harper testified that his experience supported his suspicion that Smith might have been engaging in criminal activity, because "nine times out of ten" when South asks patrons what is in their pocket and "the people start reaching for that pocket, it's something he don't want `em pulling out."
But Smith did not reach for his pockethe reached for South's arm, to stop South from reaching into his pocket. And probable cause to search requires that the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of a crime will be found.[45] Based on our review of the record, neither South nor Harper had the knowledge necessary to objectively warrant the belief that contraband or evidence of a crime would be found in Smith's pocket. As South admitted, he did not know what was in Smith's pocket"it ... could have been medication, could have been drugs, could have been beads, it could have been a number of things, could have even been candy. We just don't know."
As noted above, the legality of a seizure under the "plain feel" doctrine depends upon the incriminating character of an object being immediately apparent.[46] Here, the extension of the search into Smith's pocket was grounded on intuition, not facts and circumstances known to law enforcement supporting a reasonable belief that Smith was carrying contraband.[47] Furthermore, a search or seizure of a person must be supported by probable cause particularized to that person.[48] South admitted that it was policy to search the pockets of everyone who refused to answer the question of what was in their pockets and to refuse to permit them to leave once a pat down had begun. In this case, Harper's generalized suspicions could not justify a warrantless search of Smith. "The fact that a person belongs to a class ... which contains some members who violate the law does not create probable cause to search that person."[49]
The State also suggests that the search was reasonable because of the Club's practical interest in providing security to its patrons, arguing that "`[w]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as "reasonable"for example, searches now routine at airports and at entrances to courts and other official buildings.'"[50] But that is not the issue here. The State's comparison of a search conducted at a dance club to one conducted at an airport or courthouse is not particularly apt.[51] The Club may have been within its rights to condition entry into the Club upon consent to a search. We need not decide that issue, however, because that condition would only authorize the Club to refuse entry to a person who is unwilling to be searched. It would not *926 justify searching an unwilling person without probable cause.

(b) Smith Did Not Consent to Search of His Pocket
But that implicates the State's remaining argument that Smith consented to the search. The district court found that Smith had been notified of the Club's policy of patting down customers and made no attempt to leave before South patted him down, and Smith concedes that he consented to the initial pat down. But while Smith consented to the pat-down search, he did not consent to South's searching his pocket.
Once given, consent to search may be withdrawn.[52] Withdrawal of consent need not be effectuated through particular "magic words," but an intent to withdraw consent must be made by unequivocal act or statement.[53] If equivocal, a defendant's attempt to withdraw consent is ineffective and police may reasonably continue their search pursuant to the initial grant of authority.[54] The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "`objective'" reasonablenesswhat would the typical reasonable person have understood by the exchange between the officer and the suspect?[55] Accordingly, we must determine whether a reasonable person would have concluded that Smith's repeated attempts to thwart South's attempts to search his pocket amounted to a withdrawal of consent.
Conduct withdrawing consent must be an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both.[56] And because a consensual search by its very definition is circumscribed by the extent of the permission given, as determined by the totality of the circumstances,[57] an officer conducting a consensual search has no authority to command the person being searched to stop interfering with the search.[58] So, while a suspect's mere reluctance to facilitate a consensual search may not serve to withdraw consent,[59] the suspect's deliberate interference with the searchactions designed to prevent law enforcement from searching furtherare clearly sufficient to communicate a withdrawal of consent, because no reasonable observer could conclude that the suspect wanted the search to continue.[60]
For example, in Lowery v. State,[61] the court held a defendant withdrew his consent to search by "twice attempting] to reach into his pockets at the same time that the officer was attempting to search the pockets." Similarly, in Jimenez v. State,[62] a defendant who twice grabbed a *927 deputy's hand in an attempt to stop him from searching a pack of cigarettes was held to have withdrawn his earlier consent, and "it was improper for the officer to continue the search over the defendant's objections."
Here, the record is undisputed that Smith twice lowered his hand at the same time South was attempting to search his pocket. Smith grabbed South's wrist to prevent South from reaching into his pocket. And when South reached for Smith's pocket a second time, Smith pushed South's hand away. Only after Harper intervened and prevented Smith from interfering was South able to reach into Smith's pocket. That search cannot be characterized as consensual. Before any item was confiscated by South or Harper, Smith indicated that his consent to the initial pat down was being withdrawn, by grabbing South's wrist and later pushing South's hand away. Furthermore, South and Harper used their authority to restrict Smith's freedom of movement during the search. And as explained above, no probable cause to suspect criminal activity had been detected before Smith's pocket was searched.
Smith's actions made it apparent he did not intend to permit South or Harper to search his pockets. In fact, the only way South could complete the search was for Harper to physically restrain Smith. Any objective observer watching this scenario would conclude Smith was not consenting to the search of his pocket. Stated another way, if a suspect had to be physically restrained to prevent interference with a search of his person, the search was not consensual. Smith's actions were clearly inconsistent with the apparent consent to search.
Nonetheless, the State argues that Smith could not withdraw his consent once the pat down had begun. But as explained above, that is not the law. The case cited by the State in support of its argument stands for the proposition that while consent may be withdrawn or limited at any time before the completion of the search, it "cannot be withdrawn, however, after criminal activity has been detected."[63] But that is simply another way of saying that law enforcement does not need consent to search once probable cause has been established, which we have already concluded did not happen in this case.[64] And it is axiomatic that Smith's refusal to consent to the search of his pockets did not provide probable cause to continue. The Fourth Amendment's protections would be meaningless if refusal to consent to a search could itself justify a nonconsensual search.
Finally, the State suggests that Smith impliedly consented to the search because he was aware that Club patrons were subject to a pat down and search. That may have been the case when Smith got in line, but as noted above, Smith withdrew his consent before his pocket was searched. The Club may have been free to turn him awaybut it was not free to turn out his pockets.
As noted above, whether the established historical facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. Based on these undisputed facts, we conclude that the Fourth Amendment was violated in this case. The court erred in not suppressing *928 evidence resulting from the unlawful search. We also note that the unlawful search in this case was contrary to established law and was sufficiently culpable to be susceptible to meaningful deterrence by suppression of the evidence.[65] And in any event, the State has not questioned whether the exclusionary rule should apply under these circumstances.

VI. CONCLUSION
For these reasons, we conclude that the district court erred in denying Smith's motion to suppress and that as a result, the court erred in convicting and sentencing Smith. Under the circumstances of this case, however, the concepts of double jeopardy do not forbid the possibility of a retrial.[66] We, therefore, reverse the judgment of the district court and remand the cause for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL. HEAVICAN, C.J., not participating.
NOTES
[1] See State v. Hedgcock, 277 Neb. 805, 765 N.W.2d 469 (2009).
[2] See Neb.Rev.Stat. § 28-405(c)(27) (Reissue 2008).
[3] See Neb.Rev.Stat. § 28-416 (Reissue 2008).
[4] Hedgcock, supra note 1.
[5] Id.
[6] Id.
[7] State v. Bakewell, 273 Neb. 372, 730 N.W.2d 335 (2007).
[8] See, State v. Cody, 248 Neb. 683, 539 N.W.2d 18 (1995); State v. Vermuele, 234 Neb. 973, 453 N.W.2d 441 (1990).
[9] State v. Lara, 258 Neb. 996, 607 N.W.2d 487 (2000).
[10] See Smith v. Maryland, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).
[11] See, Minnesota v. Carter, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); Smith, supra note 10; Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).
[12] Phillip A. Hubbart, Making Sense of Search and Seizure Law, a Fourth Amendment Handbook 137 (2005).
[13] Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).
[14] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[15] See State v. Vermuele, 241 Neb. 923, 492 N.W.2d 24 (1992).
[16] State v. Dixon, 237 Neb. 630, 467 N.W.2d 397 (1991).
[17] See State v. Abdouch, 230 Neb. 929, 434 N.W.2d 317 (1989).
[18] See id.
[19] Id. at 939, 434 N.W.2d at 324, quoting Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949).
[20] Id.
[21] 1 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 1.8(b) (4th ed. 2004). See, also, Abdouch, supra note 17.
[22] Skinner v. Railway Labor Executives' Assn., 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). See State v. Mata, 266 Neb. 668, 668 N.W.2d 448 (2003), abrogated on other grounds, State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[23] Hauser v. Nebraska Police Stds. Adv. Council, 269 Neb. 541, 694 N.W.2d 171 (2005). See, State v. Wilen, 4 Neb.App. 132, 539 N.W.2d 650 (1995); 16A Eugene McQuillin, The Law of Municipal Corporations § 45.15 (3d ed. 2002).
[24] Wilen, supra note 23.
[25] Id.
[26] See, e.g., State v. Groves, 219 Neb. 382, 363 N.W.2d 507 (1985); State v. Munn, 203 Neb. 810, 280 N.W.2d 649 (1979); State v. Williams, 203 Neb. 649, 279 N.W.2d 847 (1979).
[27] State v. Roberts, 261 Neb. 403, 623 N.W.2d 298 (2001).
[28] Id.
[29] State v. Wenke, 276 Neb. 901, 758 N.W.2d 405 (2008).
[30] See State v. Gorup, 275 Neb. 280, 745 N.W.2d 912 (2008).
[31] Id.
[32] State v. Voichahoske, 271 Neb. 64, 709 N.W.2d 659 (2006).
[33] See State v. Keup, 265 Neb. 96, 655 N.W.2d 25 (2003).
[34] See Voichahoske, supra note 32.
[35] See, Minnesota v. Dickerson, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); State v. Craven, 253 Neb. 601, 571 N.W.2d 612 (1997).
[36] State v. Runge, 8 Neb.App. 715, 601 N.W.2d 554 (1999) (single-judge opinion).
[37] Dickerson, supra note 35.
[38] See id.
[39] Id., 508 U.S. at 375-76, 113 S.Ct. 2130.
[40] See Craven, supra note 35.
[41] U.S. v. Gibson, 19 F.3d 1449 (D.C.Cir. 1994).
[42] Id. at 1451.
[43] Id.
[44] U.S. v. Ashley, 37 F.3d 678 (D.C.Cir. 1994).
[45] Id.
[46] See Runge, supra note 36.
[47] See id.
[48] State v. McKinney, 273 Neb. 346, 730 N.W.2d 74 (2007).
[49] Gaioni v. Folmar, 460 F.Supp. 10, 13 n. 9 (D.C.Ala. 1978).
[50] Brief for appellee at 20-21, quoting Chandler v. Miller, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997).
[51] See, Wilkinson v. Forst, 832 F.2d 1330 (2d Cir.1987); Gaioni, supra note 49; Wheaton v. Hagan, 435 F.Supp. 1134 (D.C.N.C.1977); Jacobsen v. Seattle, 98 Wash.2d 668, 658 P.2d 653 (1983); State v. Carter, 267 N.W.2d 385 (Iowa 1978); State v. Iaccarino, 767 So.2d 470 (Fla.App.2000).
[52] See, State v. Konfrst, 251 Neb. 214, 556 N.W.2d 250 (1996); State v. French, 203 Neb. 435, 279 N.W.2d 116 (1979).
[53] U.S. v. Sanders, 424 F.3d 768 (8th Cir. 2005).
[54] Id.
[55] Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).
[56] Sanders, supra note 53.
[57] See State v. Rathjen, 16 Neb.App. 799, 751 N.W.2d 668 (2008).
[58] See Sanders, supra note 53.
[59] See Burton v. U.S., 657 A.2d 741 (D.C. 1994).
[60] See Sanders, supra note 53.
[61] Lowery v. State, 894 So.2d 1032, 1034 (Fla. App.2005).
[62] Jimenez v. State, 643 So.2d 70, 72 (Fla. App. 1994).
[63] See People of Virgin Islands v. Nadal, No. F195/2006, 2007 WL 703494 at *4 (V.I.Super. Feb. 5, 2007).
[64] Compare, e.g., State v. Chronister, 3 Neb. App. 281, 526 N.W.2d 98 (1995) (alert by drug detection dog established probable cause for warrantless search before suspect withdrew consent).
[65] See, Herring v. U.S., ___ U.S. ___, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009); State v. Nuss, 279 Neb. 648, 781 N.W.2d 60 (2010).
[66] See Rogers, supra note 22.