742 P.2d 825

**CITY OF PHOENIX,**
**Petitioner Employer,**

**State Compensation Fund,**
**Petitioner Carrier,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**John A. Robertson (Dec'd), Evorah Faye Robertson (Widow), Respondent Employee,**

**Sixpence Inns of America, Respondent Employer,**

**Mission Insurance Company, Respondent Carrier.**

**No. 1 CA–IC 3453.**

Court of Appeals of Arizona, Division 1, Department C.

April 7, 1987.

Reconsideration Denied May 28, 1987.

Review Denied Sept. 22, 1987.

Robert K. Park, Chief Counsel, State Compensation Fund by Peter C. Kilgard, Phoenix, for petitioners.

Dennis P. Kavanaugh, Chief Counsel, The Indus. Com'n of Arizona, Phoenix, for respondent.

Spencer K. Johnston, Phoenix, for respondent employee.

Lewis and Roca by Merton E. Marks, R. Todd Lundmark, James K. Kloss, Phoenix, for respondent employer and carrier.

## OPINION

EUBANK, Judge.

This is a special action review of an Industrial Commission award which granted death benefits against the petitioner employer, City of Phoenix (City) and the petitioner carrier, State Compensation Fund (Fund). Three issues are presented:

(1) Whether the respondent employee (deceased) was an employee of the respondent employer (Sixpence) rather than an independent contractor.

(2) Whether the deceased was jointly employed by the City and Sixpence at the time of his injury.

(3) If the deceased was an independent contractor of Sixpence, should the death benefits be apportioned between the deceased and the City?

We conclude that the deceased was an independent contractor as to Sixpence Inns of America (Sixpence) and, at the time of his injury, he was solely an employee of the City. The award is reasonably supported by the evidence, and we affirm.

The deceased was an off-duty City police officer working security for Sixpence when he suffered a fatal gunshot wound. A

departmental report described the incident as follows:

> At approximately 8:45 p.m., Officer Robertson [deceased] observed a black male in the south parking lot of the motel and he recognized him as a person he had previously warned about trespassing. Officer Robertson contacted the man and asked for his identification. The man produced an Arizona driver's license identifying him as Randy J. Harris. As Officer Robertson was using his police radio to run a warrant check on Harris two men yelled at him that they had been robbed by Harris. It was later determined that Harris and two female companions (suspects 2 and 3) had just robbed the men. As they yelled at Robertson he told Harris to stand still. As Officer Robertson turned to look at the robbery victims Harris pulled a gun from his jacket pocket and shot Officer Robertson in the neck, critically wounding him. Harris fled the scene and was arrested the next day along with suspects 2 and 3.

On November 19, 1984, Officer Robertson died as a result of the gunshot wound.

On December 13, 1984, his widow and dependents filed a claim for death benefits against the City of Phoenix. On December 18, 1984, his widow and dependents filed another claim for death benefits against Sixpence. On December 19, 1984, Mission Insurance Co. denied the claim on behalf of Sixpence. On December 20, 1984, the Fund issued a notice of claim status voluntarily consenting to pay benefits pending the determination of whether the deceased was an employee of the City or Sixpence at the time of his injury. The widow timely requested hearings on both notices of claim status and consolidated hearings were held.

The facts are that approximately one year before this incident, Whitey Carson, a regional manager for Sixpence and responsible for its three Arizona Inns, contacted Jimmy B. Townsend, a police sergeant employed by the City, with regard to providing security at the Sixpence located at Black Canyon Freeway near McDowell Road. This was a high crime area, and for the safety of their guests, Mr. Carson wanted to hire off-duty police officers to patrol during high risk periods. On November 16, 1983, Sergeant Townsend wrote to Mr. Carson confirming their arrangement:

> I will be responsible for hiring the officers and scheduling them as independent contractors. I will also be responsible for making sure that experienced officers work at the Sixpence, and they will know and perform all duties expected of them. They will be in police uniform and issue warnings and make arrests as necessary. The officers will work from 10 p.m. to 3 a.m. seven (7) days a week.
>
> The Sixpence will pay $50.00 per shift, to be paid twice monthly with no deductions. I will disperse the pay to the officers.
>
> I also request I be paid an additional $25.00 per month to supervise the scheduling and activities of the officers.

Subsequently, this agreement was orally amended with regard to the method of payment. After several weeks, the officers requested and were paid in cash at the end of each shift. There was no evidence that the deceased had ever reviewed this letter agreement or was aware of its contents.

Officers were required to obtain authorization for off-duty work assignments. The deceased had obtained the necessary off-duty work permit on December 30, 1983. The permit indicated that he would be employed by Sixpence, that the motel had industrial insurance, and that he would work in uniform. Officers performing off-duty work did so in accordance with Phoenix Police Department General Order B–5, which required them to "take appropriate police action" and "take police action on felony or other serious criminal matters coming to their attention, . . . ."

Since Sixpence wanted the off-duty officers to be highly visible, they wore their full City uniforms, including a service revolver and a two-way radio which allowed them immediate contact with the police department. The officers performed a variety of activities for Sixpence including: pa-

trolling the parking lot, moving unauthorized vehicles, confronting trespassers and loiterers, investigating disturbances in the rooms or on the property, locking the pool area and laundry room in the evenings, and changing light bulbs. They also accompanied the desk clerk to rooms that needed to be made up or to inform guests of refused credit cards or unpaid long-distance bills. The officers performed favors for the management from time to time, including delivering an ice bucket or rollaway bed. The officers kept a log of their activities and contacts during each shift, which was sent to Sixpence headquarters every thirty days. If the officers arrested anyone, an arrest report was included in the log. The officers also kept a card file of all individuals investigated on the property.

Contradictory testimony was presented as to the amount of control that Sixpence's resident managers exercised over the officers. Previous manager Jennifer Thomas testified that Mr. Carson told her the officers "were exactly like any other employee on the property; that we were their boss." This testimony was refuted by Mr. Carson. He testified that no such conversation occurred and that he told his managers "they're professional police officers on duty, and to allow them to do their job." He also testified that "the managers had no right to tell those people how to perform. They were professionals and they knew what they were doing and I didn't want the manager to interfere." If the managers had any complaints about an officer, they were instructed to contact Mr. Carson and he would resolve the problem. This testimony was corroborated by another former manager Clifford J. Kaiser. He testified that the officers knew their job and did it without input from the manager unless the manager specifically asked for assistance. He also testified that he never interfered with the officers' performance of their work.

The parties entered into a stipulation of eleven facts that included:

(10) While performing security services for Sixpence, they [Sixpence] did not have the right to control Robertson's actions while he was engaged in a function required of him as an officer of the Phoenix Police Department.

(11) Officer Robertson was in the line of duty as a City of Phoenix Police Officer when he was shot. His on duty status began when the robbery victim yelled to him that he had been robbed by the subject then being questioned by Robertson.

On August 1, 1985, the administrative law judge entered an award finding that the deceased "was an independent contractor and was not an employee of Six Pence Inn" and that, at the time of his injury, he was solely an employee of the City. Therefore, the Fund was solely responsible for death benefits to the widow and dependents. The decision was affirmed on administrative review and this special action followed.

## I. EMPLOYEE OR INDEPENDENT CONTRACTOR

First, we address the City's argument that the deceased was an employee of Sixpence at the time of his injury instead of an independent contractor. The relevant statutory guidelines for determining whether a worker is an independent contractor or an employee are contained in A.R.S. § 23–902:

A. Employers subject to the provisions of this chapter are ... every person who has in his employ any workmen or operatives regularly employed in the same business or establishment under contract of hire, except domestic servants.... For the purposes of this section 'regularly employed' includes all employments, whether continuous throughout the year, or for only a portion of the year, in the usual trade, business, profession or occupation of an employer.

\*    \*    \*    \*    \*    \*

C. A person engaged in work for another, and who while so engaged is independent of the employer in the execution of the work and not subject to the rule or control of the person for whom the work is done, but is engaged only in the performance of a definite job or piece of work, and is subordinate to the employer

only in effecting a result in accordance with the employer's design, is an independent contractor, and an employer within the meaning of this section.

The distinction between an employee and an independent contractor is discussed by Professor Larson in his workers' compensation treatise:

> The traditional test of the employer-employee relation is the right of the employer to control the details of the work. It is the ultimate right of control, under the agreement with the employee, not the overt exercise of that right, which is decisive. If the right of control of details goes no further than is necessary to ensure a satisfactory end result, it does not establish employment.

1C A. Larson, *Workmen's Compensation Law* § 44.00 at 8–40 (1986).

■ In determining the right to control, courts will look to the totality of the circumstances of each case and examine the various indicia of control. *Reed v. Industrial Commission,* 23 Ariz.App. 591, 534 P.2d 1090 (1975). Various indicia of control include: the duration of the employment; the method of payment; who furnishes equipment; the right to hire and fire; who bears responsibility for workers' compensation insurance; the extent to which the employer may exercise control over the details of the work; and whether the work was performed in the usual and regular course of the employer's business. *Home Insurance Company v. Industrial Commission,* 123 Ariz. 348, 599 P.2d 801 (1979).

■ Before proceeding to a substantive review of the issues, we recognize the standard of review in this case as enunciated by the supreme court in *Hunt Building Corp. v. Industrial Commission,* 148 Ariz. 102, 713 P.2d 303 (1986):

> This court and the court of appeals must consider all evidence in the light most favorable to sustaining the Commission's award. (citation omitted.) We have stated that '[a]wards of the Industrial Commission will be sustained if they are reasonably supported by the evidence and appellate courts will not weight evidence but consider it in a light most favorable to sustaining the awards.' (citations omitted.)

148 Ariz. at 106, 713 P.2d at 307.[1]

In this case, both Mr. Carson and Mr. Kaiser testified that the off-duty officers were professionals, knew what was involved in performing off-duty security work and did it without interference. Sixpence managers had no control over the officers' performance of security activities other than to request their assistance if a particular problem arose. Although this was partially in conflict with testimony from Ms. Thomas, her testimony appears to have been rejected by the administrative law judge. *Cf. Pearce Development v. Industrial Commission,* 147 Ariz. 582, 583, 712 P.2d 429, 430 (1985) (findings implicit in an administrative law judge's award).

The officers were paid $50.00 cash at the end of each individual shift and were not on the motel's regular payroll; nor were any payroll deductions made. With the exception of a log book provided for recording security activity on each shift, the officers provided all of their own equipment. Sixpence managers did not have the right to hire or fire these officers. Problems with the officers' performance were to be reported to Mr. Carson who would in turn deal with Sergeant Townsend. There was testimony from Ms. Thomas that on one occasion when a substitute officer filled in for a regular officer, she spoke directly with Sergeant Townsend and requested that this officer not be sent back in the future.

With regard to whether this work was performed in the usual and regular course of the motel's business, we note that the motel was located in a high crime area and had been the scene of rape, assault, prostitution, drug sales, and stolen property sales. Mr. Carson testified that one of his primary concerns was the safety of the guests and their property while staying at

---

1. *But cf. Anton v. Industrial Commission,* 141 Ariz. 566, 688 P.2d 192 (App.1984) (determination of whether claimant is an independent contractor is a conclusion of law, and an appellate court must make an independent determination).

Sixpence. This comports with an Innkeeper's duty to make the premises reasonably safe for use by invitees. *Bennett v. Estate of Baker*, 27 Ariz.App. 596, 557 P.2d 195 (1976); *Burke v. Arizona Biltmore Hotel, Inc.*, 12 Ariz.App. 69, 467 P.2d 781 (1970). Thus, under the circumstances the work was performed in the usual and regular course of the motel business. *See* Annot., *Liability of Hotel or Motel Operator for Injury to Guest Resulting from Assault by Third Party*, 28 A.L.R.4th 80 (1984).

After reviewing all of these elements, we conclude that the evidence as a whole supports the administrative law judge's finding that the deceased was an independent contractor. (We note that under the appropriate indicia of control, Sergeant Townsend could have been an independent contractor/employer because he contracted to provide the security for Sixpence and selected the officers to work there). Since we do not find that the deceased was an employee of Sixpence, it is not necessary to reach the City's second argument regarding joint employment.

## II.  APPORTIONMENT

The City's last argument is that because the deceased was an independent contractor at the time of his death, his death benefits should be apportioned between the City and him. Again, this is essentially a joint employment argument, this time between the deceased and the City.

The City cites *Pinson v. Industrial Commission*, 79 Ariz. 21, 281 P.2d 962 (1955), in support of its argument. We believe this case is factually distinguishable. In *Pinson*, the claimant owned an ice storage house and was also regularly employed by a produce company to deliver produce. He delivered both products from his own truck. He was killed in a motor vehicle accident while making both types of deliveries. The court held that he was engaged in dual employment at the time of his death and, therefore, workers' compensation benefits had to be apportioned between the two employments.

In this case, it was stipulated by the parties, and found by the Commission, that the deceased was in the line of duty as a City police officer when he was shot. His on-duty status began when the robbery victim yelled to him that he had been robbed by the subject being questioned. Although the deceased was performing a function of his role as an independent contractor security guard at the time he stopped the subject for questioning, that role ceased as soon as he had reason to believe a felony had been committed. At that point, he became solely an officer of the police department. The evidence is clear that the Sixpence Inn had no right to exercise control over his actions when he was engaged in such a function. While we recognize the benefit to Sixpence of the officer's security guard function in stopping and questioning the subject, we find that this was separate and distinct from his obligations as a City of Phoenix police officer and that these roles were not co-existent. The "off duty" police cases, *Peetz v. Industrial Commission*, 124 Ariz. 324, 604 P.2d 255 (1979); *Buick v. Industrial Commission*, 82 Ariz. 129, 309 P.2d 257 (1957); *Wyckoff v. Industrial Commission*, 14 Ariz.App. 288, 482 P.2d 897 (1971), are distinguished on the basis of their fact situations. For this reason, we reject the City's argument that death benefits should be apportioned.

For all of the foregoing reasons, the award of the Industrial Commission is affirmed.

FROEB, C.J., and CORCORAN, J., concur.