COOPER, Appellee,

v.

CITY OF DAYTON, Appellant, et al.

[Cite as *Cooper v. Dayton* (1997), 120 Ohio App.3d 34.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16227.

Decided June 6, 1997.

*James A. Hensley, Jr.,* for appellee.

*J. Anthony Sawyer,* Director of Law, and *Susan S. Silbertstein,* Chief Administrative Counsel, for appellant.

Brogan, Judge.

The city of Dayton appeals from the Montgomery County Common Pleas Court's October 8, 1996 decision and order granting summary judgment in favor of appellee Kevin B. Cooper.

The city advances three assignments of error. First, the city contends that the trial court erred by granting Cooper's summary judgment motion and declaring the city his employer for workers' compensation purposes for an off-duty injury Cooper sustained. Next, the city claims that the trial court erred by denying its summary judgment motion and failing to find that it was not Cooper's employer for workers' compensation purposes. Finally, the city asserts that the trial court erred by awarding Cooper the statutory maximum attorney fees without providing the city an opportunity to be heard and without sufficient evidence to justify the award.

The present appeal stems from an injury Cooper sustained on December 2, 1994, while attempting to stop a shoplifter outside a Groceryland store. Cooper, a Dayton police officer, was out of uniform and off-duty, working as a loss-prevention specialist at the grocery store.[1] He had obtained the part-time

---

1. In affidavits and various discovery documents, Cooper asserted alternatively that he "was working" as a loss-prevention specialist at the time of his injury and that he was doing

security work from a fellow police officer, John D. Pawelski, who acted as an independent contractor supplying the grocery store with off-duty officers to prevent shoplifting. Pawelski's work for Groceryland was conducted on his own time and was unrelated to his work as a city police officer. The work consisted primarily of scheduling off-duty officers for morning or afternoon shifts at the store, recording the officers' hours worked, and billing Groceryland for the security work. Groceryland paid Pawelski $15 per hour for the officers' work, and Pawelski, in turn, paid the officers approximately $11 per hour.

While working as a security specialist on December 2, 1994, Cooper observed a shopper stealing meat. Cooper followed the shopper outside into the parking lot, and the shopper entered a vehicle driven by a second person. The two suspects then attempted to leave. In response, Cooper drew his service revolver, identified himself as a police officer, displayed his badge, and ordered the suspects to place their hands in the air. Rather than complying, the two suspects sped toward Cooper, who jumped onto the car's hood. The driver then braked hard in front of the store at Troy and Stanley streets, causing Cooper to be thrown to the pavement. As a result of the incident, Cooper suffered lacerations, abrasions, a contusion to the knee, and a tibial fracture. He remained hospitalized until December 4, 1994.

Following his release, Cooper filed an application for compensation and medical benefits with the Bureau of Workers' Compensation, identifying the city of Dayton as his employer and listing his occupation as "police officer." [2] The Bureau of Workers' Compensation administrator subsequently issued a January 9, 1995 order allowing Cooper's claim against the city. A district hearing officer

---

personal grocery shopping after having completed his loss-prevention work. The trial court noted this factual dispute and, for purposes of Cooper's summary judgment motion, assumed he was doing off-duty loss-prevention work at the time of his injury. Given the requirement that on a motion for summary judgment, conflicting evidence must be construed in the nonmoving party's favor, we also assume Cooper was engaged in off-duty loss-prevention work at Groceryland. *Bowen v. Kil–Kare, Inc.* (1992), 63 Ohio St.3d 84, 585 N.E.2d 384; *K-Swiss, Inc. v. Cowens Sports Ctr., Inc.* (Nov. 8, 1995), Greene App. No. 95–CA–48, unreported, 1995 WL 655945.

2. The city properly notes, however, that in hospital admission records, Cooper listed Groceryland as his employer. Additionally, the city stresses that Cooper attempted to file a workers' compensation claim against Groceryland but was unsuccessful because he was not a Groceryland employee. The city also notes that Cooper neither received injury leave from the city nor filed an injury report as he had with prior work-related injuries. Finally, the city stresses Cooper's failure to file an off-duty employment request as required by police department policy. Although these facts may be relevant to the issue of whether Cooper initially believed the city bore workers' compensation responsibility for his injury, they have no relevance to the issue of whether the city, as a matter of law, was in fact Cooper's employer for workers' compensation purposes. Cooper's subjective belief on the issue is unimportant. Ohio law, not Cooper's initial actions, determines who bears workers' compensation responsibility.

then denied the city's appeal from the administrator's order, finding the appeal not timely filed. A staff hearing officer affirmed the district hearing officer's ruling. Thereafter, the Ohio Industrial Commission refused to hear the city's appeal from the staff hearing officer's order.

The city subsequently filed an appeal in the Montgomery County Common Pleas Court. The trial court first recited the foregoing procedural history and then proceeded to address the merits of the city's appeal, ultimately finding the city's arguments unpersuasive and granting summary judgment in Cooper's favor. In response, the city filed a timely appeal to this court, advancing three assignments of error. On March 25, 1997, we *sua sponte* ordered the city to show cause why its failure to timely appeal from the Bureau of Workers' Compensation's initial order allowing Cooper's claim did not compel us to affirm the trial court's judgment or dismiss the appeal. The city responded to the show cause order on April 2, 1997.

After reviewing the city's response, we continue to question this court's and the trial court's jurisdiction to hear the city's appeal. In short, we are not entirely convinced that the city's failure to timely appeal the BWC administrator's award did not deprive us of jurisdiction to hear the present appeal. Although we find much of the city's argument on the issue unpersuasive,[3] this court's own research has revealed no clear answer.

---

3. In its response to the March 25, 1997 show cause order, the city raised four arguments in opposition to this court finding a lack of jurisdiction. In its first argument, the city contended that only "employers" were required to file an administrative appeal within fourteen days. Since it maintained that it was not Cooper's "employer" with respect to his injury, the city insisted that the fourteen-day requirement did not apply. In a January 9, 1995 order the BWC administrator determined that the city *was* Cooper's employer with respect to his Groceryland injury. Thus, despite the city's protestations to the contrary, the administrator's ruling established the city's role as Cooper's employer for workers' compensation purposes. If the city wished to challenge the administrator's ruling, R.C. 4123.511(B)(1) granted it, as Cooper's employer, fourteen days to appeal. In a second argument, the city insisted that R.C. 4123.52, the "continuing jurisdiction" statute, granted the Industrial Commission authority to hear its administrative appeal despite the city's failure to timely appeal the BWC administrator's ruling. The administrative proceedings below, however, expressly were conducted pursuant to R.C. 4123.511, which provides for administrative appeals from the BWC administrator's initial determination, as well as R.C. 4121.34 and R.C. 4121.35, which grant district hearing officers and staff hearing officers *original jurisdiction* to determine and review workers' compensation claims. In addition, R.C. 4121.35 also provides: "The decision of a staff hearing officer under division (D) of section R.C. 4123.511 of the Revised Code is the decision of the commission * * * unless the commission hears an appeal * * *." In the present case, the Industrial Commission chose not to hear the city's appeal. Consequently, the staff hearing officer's September 21, 1995 order, which arose from his R.C. 4121.35 *original jurisdiction*, became the order of the Industrial Commission for purposes of an appeal into the common pleas court. Thus, none of the proceedings was conducted pursuant to R.C. 4123.52, which, under certain circumstances, grants the Industrial Commission "continuing jurisdiction" to modify former findings or orders. In a third argument, the city contends that its failure to file

**38**

In any event, we have decided to view the present situation as simply raising a failure-to-exhaust-administrative-remedies question. Although the city did file an appeal at each administrative level, the appeals were rejected as untimely and included no substantive review. In our view, a party cannot be deemed to have exhausted its administrative remedies by filing an untimely administrative appeal and having subsequent administrative appeals rejected expressly on that basis.

In *Arbar Corp. v. Wellmeier* (Sept. 20, 1995), Greene App. No. 94–CA–99, unreported, 1995 WL 558781, this court noted that "a failure to exhaust administrative remedies has been viewed as a jurisdictional defect which will deprive a common pleas court of jurisdiction to hear an appeal in a workers' compensation case." At least one other appellate court has concluded, however, that a failure to exhaust administrative remedies is not a jurisdictional defect, but an affirmative defense that must be raised. See *Jackson v. Ohio Bur. of Workers' Comp.* (1994), 98 Ohio App.3d 579, 585, 649 N.E.2d 30, 34. Most recently, the Ohio Supreme Court in *Jones v. Chagrin Falls* (1997), 77 Ohio St.3d 456, 674 N.E.2d 1388, also held that the doctrine of failure to exhaust administrative remedies is not a jurisdictional defect, but an affirmative defense that may be waived if not timely asserted. Although *Jones* considered the doctrine in the context of declaratory judgments, the opinion contains broad language that seemingly would apply in other contexts as well.[4] In the present case, Cooper did not raise the failure-to-exhaust-administrative-remedies issue at any time before the trial court

---

a timely administrative appeal does not compel dismissal because proceedings in the trial court were *de novo*. The city then relies upon, *inter alia*, this court's opinion in *Alcorn v. Spalding & Evenflo Corp.* (1992), 79 Ohio App.3d 561, 607 N.E.2d 904. In that case, we held that the trial court had jurisdiction to hear an employer's timely appeal despite the employer's failure to first appeal a regional review board's order to the Industrial Commission. We find *Alcorn* distinguishable, however. The critical distinction between *Alcorn* and the present case is that in *Alcorn*, one party or the other did file a timely appeal at each administrative level. *Alcorn* simply establishes that if *either* party perfects a timely appeal at each administrative level (*i.e.*, "the necessary prior stages of review have been performed"), then "any party may raise any issue concerning coverage before the trial court." *Id.* at 568, 607 N.E.2d at 908.

In a final argument, the city contends that dismissing this action for its failure to timely appeal the BWC administrator's order is "patently unjust, harsh, and nonsensical." In support of this contention, the city cites *Singer Sewing Machine Co. v. Puckett* (1964), 176 Ohio St. 32, 26 O.O.2d 303, 197 N.E.2d 353; *Zuljevic v. Midland Ross Corp.* (1980), 62 Ohio St.2d 140, 16 O.O.3d 116, 403 N.E.2d 986; and *Thompson v. Reibel* (1964), 176 Ohio St. 258, 27 O.O.2d 159, 199 N.E.2d 117. These cases, however, establish only that a claimant's failure to timely file his R.C. 4123.512 *complaint* with the trial court is not jurisdictional.

4.  In particular, the court framed the issue as "whether failure to exhaust administrative remedies is a jurisdictional defect, or an affirmative defense that may be waived." The court also noted its failure to locate "Ohio Supreme Court precedent supporting the court of appeals' conclusion that failure to exhaust administrative remedies is a jurisdictional defect."

or in his brief to this court. Consequently, we will treat the issue as a waived affirmative defense and proceed to the merits of the city's appeal.

■ In its first two assignments of error, the city contends that the trial court erred by granting summary judgment in Cooper's favor and denying summary judgment for the city. Both assignments of error involve the same legal issue: whether the city was Cooper's "employer" for workers' compensation purposes at the time of his injury. If so, the trial court properly granted Cooper's motion and properly denied the city's motion.

In its brief to this court, the city essentially raises two legal arguments against granting Cooper summary judgment. First, the city contends that R.C. 4123.01(A)(1)(b) provided the exclusive means of recovery for Cooper's injury. That provision states:

"Every person in the service of an independent contractor or subcontractor who has failed to pay into the state insurance fund the amount of premium determined and fixed by the administrator of workers' compensation for his employment or occupation * * * shall be considered as the employee of the person who has entered into a contract, whether written or verbal, with such independent contractor unless such employees or their legal representatives or beneficiaries elect, after injury or death, to regard such independent contractor as the employer."

In the present case, the record reveals that Pawelski acted as an independent contractor for Groceryland. Furthermore, the parties do not dispute Pawelski's failure to pay into the state workers' compensation fund. Under these circumstances, the city contends that Cooper was "in the service of" Pawelski, a non-complying employer.[5] Therefore, pursuant to R.C. 4123.01(A)(1)(b), the city insists that Groceryland, by virtue of its relationship with Pawelski, could be deemed Cooper's "employer" for purposes of his injury. Specifically, the city reasons:

"Faced with a non-complying employer (Pawelski) and one who entered into a contract with Pawelski (Groceryland), who could have and should have seen to Pawelski's compliance with the Act, as part of its contract with him, there is simply no statutory or other legal basis for imposing employer status, for purposes of the Ohio Workers' Compensation Act, on yet a third entity, the City

---

[5]. Even if Cooper was not "in the service of" Pawelski and was instead an independent contractor as he alleges, the city argues that "[a]s an independent contractor, Cooper would be responsible for obtaining his own workers' compensation coverage" and "logically he could not simultaneously be an 'employee' of the city." As we will explain, however, Cooper was neither an independent contractor nor an employee of Pawelski at the time of his injury. Rather, he was an employee of the city of Dayton.

of Dayton, merely because of its employment of Cooper at other times. The trial court's decision to do so, merely because Cooper elected to file his claim against the city and not against Pawelski or Groceryland, as permitted by the statute, constitutes an unprecedented and unwarranted judicial extension of statutory liability for workers' injuries."

This court would find the city's argument persuasive if Cooper had injured himself while stocking shelves or performing other work at Groceryland unrelated to his work as a Dayton police officer. As we will explain more fully below, however, Cooper was acting as a police officer at the time of his injury. Consequently, we conclude that the city of Dayton, not Groceryland or Pawelski, was Cooper's "employer" for workers' compensation purposes. As a result, we find R.C. 4123.01(A)(1)(b) inapplicable.

The city's reliance upon the statute ignores the role Cooper's status as a Dayton police officer played in his conduct. Contrary to the city's argument, the trial court did not impose "employer" status upon the city merely because of its employment of Cooper "at other times" or because he elected to file his claim against the city. Instead, as we will explain, the trial court properly imposed employer status on the city because, at the time of his injury, Cooper was performing his duty as an officer of the police department.

In a second argument, the city contends that the trial court erred by relying upon *Lord v. Daugherty* (1981), 66 Ohio St.2d 441, 20 O.O.3d 376, 423 N.E.2d 96, and *Fisher v. Mayfield* (1990), 49 Ohio St.3d 275, 551 N.E.2d 1271, to find that Cooper's injury occurred in the course of, and arose out of, his city employment. Specifically, the city argues that *Lord* and *Fisher* are factually distinguishable from the present case. In addition, the city claims that the trial court misapplied the legal analysis set forth in the two cases.

We begin our resolution of the city's argument with a brief review of the Ohio Supreme Court's *Lord* and *Fisher* opinions. In those two cases, the court attempted to clarify R.C. 4123.01(C), which authorizes workers' compensation coverage for any injury "received in the course of, and arising out of, the injured employee's employment." In *Fisher*, the court first recognized the historical significance of the phrases "in the course of" and "arising out of," stating:

"Ohio's workers' compensation statute, as do those of the vast majority of states, contains the basic coverage formula: 'in the course of, and arising out of,' employment. A leading scholar in this area of the law, Professor Larson, has noted that '[t]he heart of every compensation act, and the source of most litigation in the compensation field, is the coverage formula. * * * Few groups of statutory words in the history of law have had to bear the weight of such a mountain of interpretation as has been heaped upon this slender foundation.

* * *' 1 Larson, The Law of Workmen's Compensation (1984) 3–1 to 3–3, Section 6.10." *Fisher, supra,* 49 Ohio St.3d at 276, 551 N.E.2d at 1273.

The significance of the two phrases stems from the Ohio Supreme Court's long-standing recognition that "[a]n injury sustained by an employee is compensable under the Workers' Compensation Act only if it was 'received in the course of, and arising out of, the injured employee's employment.'" *Id.* at 276, 551 N.E.2d at 1273; *Bralley v. Daugherty* (1980), 61 Ohio St.2d 302, 303, 15 O.O.3d 359, 360, 401 N.E.2d 448, 449.

In *Lord v. Daugherty, supra,* the Ohio Supreme Court addressed the "arising out of" element, finding that the phrase imposed a causal-connection requirement. The court then applied a "totality of the circumstances" test to determine the existence of a causal connection between an employee's injury and his employment:

"[W]hether there is a sufficient 'causal connection' to justify the injured party's right to participate in the Workers' Compensation Fund depends upon the 'totality of the facts and circumstances' regarding the accident. Such circumstances include: (1) the proximity of the scene of the accident to the place of employment, (2) the degree of control the employer had over the scene of the accident, and (3) the benefit the employer received from the injured employee's presence at the scene of the accident." *Lord, supra,* 66 Ohio St.2d at 444, 20 O.O.3d at 378, 423 N.E.2d at 98.

The *Fisher* court explained, however, that the foregoing factors are "illustrative" rather than "exhaustive." *Fisher, supra,* 49 Ohio St.3d at 279, 551 N.E.2d at 1275, fn. 2. Concerning the "in the course of" element, the *Fisher* court interpreted the phrase as relating to the time, place, and circumstances of the injury. *Id.* at 277, 551 N.E.2d at 1274. The court also recognized the "conjunctive nature of the coverage formula 'in the course of and arising out of' the employment." *Id.*

In its brief to this court, the city first argues that both *Fisher* and *Lord* are factually distinguishable from the present case. Specifically, the city notes that both cases involved "single-employment" situations, whereas employer status in the present case arguably could fall upon two or more entities. The city also faults the trial court for its failure to consider the "totality of the circumstances" and to apply the *Lord* causation factors to Pawelski. The city insists that applying the *Lord* factors to Pawelski would result in Pawelski being Cooper's employer for workers' compensation purposes. Finally, the city argues that proper application of the *Lord* and *Fisher* analysis does not support the trial court's conclusion.

Initially, we note our agreement with the city's argument that *Lord* and *Fisher* are factually distinguishable from the present case. In both cases, the identity of the injured worker's employer was undisputed. The only issue was whether the injury "arose out of" the employment relationship and occurred "in the course of" employment. In the present case, however, employer status arguably could rest with the city of Dayton, Pawelski or, through R.C. 4123.01(A)(1)(b), the non-complying-independent-contractor provision, even Groceryland.

Notwithstanding this distinction, we remain convinced that the *Lord–Fisher* analysis provides a viable analytical framework to resolve the present dispute. In reaching this conclusion, we note that the Ohio Supreme Court's two-prong test for determining workers' compensation employer status is flexible and intended to apply to a variety of factual scenarios. In *Fisher, supra,* the court explained:

"[W]hen applying the analysis set forth above, a reviewing court must examine the separate and distinct facts of each case. Historically, similar fact patterns have promulgated their own set of rules. For example, the recreational activity cases have developed a unique group of tests, as well as the so-called 'coming and going' cases. Professor Larson's treatise on workers' compensation categorizes the cases in his discussion as to the fact patterns involved. This is because workers' compensation cases are, to a large extent, very fact specific. As such, no one test or analysis can be said to apply to each and every factual possibility. Nor can only one factor be considered controlling. Rather, a flexible and analytically sound approach to these cases is preferable. Otherwise, the application of hard and fast rules can lead to unsound and unfair results." *Fisher, supra,* 49 Ohio St.3d at 280, 551 N.E.2d at 1276.

Unfortunately, Ohio's common law includes no category of cases involving off-duty police officers injured under the present circumstances. This court's research has revealed little Ohio case law applicable to the topic. After reviewing the circumstances surrounding Cooper's injury, the *Lord–Fisher* two-part "employer" test, and relevant case law from other jurisdictions, however, we conclude that Cooper acted as a city employee at the time of his injury.

In reaching this conclusion, we look first to Cooper's responsibilities as (1) a loss-prevention specialist and (2) a city police officer. As a loss-prevention specialist, Cooper's responsibilities typically did not include arresting shoplifters. In fact, the city acknowledges that Groceryland loss-prevention specialists called on-duty police officers to arrest and transport shoplifting suspects. This procedure is consistent with R.C. 2935.041(A) and 2935.041(C)(2). The former provision allows merchants and their employees or agents to "detain" suspected shoplifters for a reasonable time. The latter provision authorizes this detention for the purpose of causing an arrest to be made by a peace officer.

Conversely, in his role as a peace officer, R.C. 2935.041(E) allowed Cooper to arrest without a warrant whenever he had probable cause to believe a suspect had shoplifted from a mercantile establishment. Similarly, R.C. 2935.03 provides that police officers "shall arrest and detain, until a warrant can be obtained, a person found violating * * * a law of this state." Consequently, at the time he attempted to arrest the shoplifting suspect, Cooper necessarily was acting in his role as a Dayton police officer rather than as a private loss-prevention guard. Contrary to the city's argument, Cooper's actions were not actions that could have been taken by a merchant's agent pursuant to R.C. 2935.041. As we explained above, a private merchant's agent can only *detain* a suspect and call a peace officer to actually make the arrest. R.C. 2935.041(C)(1). This conclusion is strengthened by Cooper's acts of identifying himself as a Dayton police officer, displaying his badge, drawing his service revolver, and ordering the fleeing suspects to place their hands in the air. Certainly no one other than a police officer could perform these actions. Without question, a private loss-prevention guard could not lawfully invoke the authority of the police department. See R.C. 2921.51. Given the record before us, we simply cannot agree that Cooper acted in a private capacity and merely tried to detain the suspects when he displayed his city badge and drew his service revolver. To the contrary, Cooper performed in the line of duty as a Dayton police officer attempting to arrest a suspected violator of the law.

Application of the *Lord–Fisher* analysis to the present case supports our conclusion. As we recognized above, an injury sustained by an employee is compensable under workers' compensation statutes only if it was "received in the course of, and arising out of," the employee's employment. *Fisher, supra,* 49 Ohio St.3d at 276, 551 N.E.2d at 1273. The "in the course of" requirement relates to the time, place, and circumstances of the injury, *Id.* at 277, 551 N.E.2d at 1274, while the "arising out of" element "contemplates a causal connection between the injury and the employment." *Id.* at 278, 551 N.E.2d at 1274. In *Lord,* the Ohio Supreme Court recited three nonexclusive factors to aid in the search for a causal connection. As we noted above, these factors are (1) the proximity of the accident scene to the place of employment, (2) the degree of control the employer had over the scene, and (3) the benefit the employer received from the injured employee's presence. *Lord, supra,* at the syllabus. The final determination, however, requires a court's consideration of the totality of the circumstances. *Fisher, supra,* 49 Ohio St.3d at 279, 551 N.E.2d at 1275, fn. 2. Moreover, "the phrase 'in the course of, and arising out of,' must be accorded a liberal construction" in favor of awarding benefits. *Id.* at 278, 551 N.E.2d at 1274.

After reviewing the record and the foregoing criteria, we conclude that Cooper acted "in the course of" his city employment and that the injury "arose out of" that employment. In reaching this conclusion, we first acknowledge that the *Lord–Fisher* analysis works best when an employee holds only one job and the sole issue is whether the employee's injury stemmed from his employment. In the present case, however, Cooper worked full-time as a police officer and moonlighted as a loss-prevention specialist. The two jobs admittedly share some similar characteristics. Nevertheless, after applying the appropriate factors and considering the totality of the circumstances, we find Cooper's injury more closely related to his city employment than his Groceryland work.

Cooper sustained an injury after pursuing a suspected shoplifter outside Groceryland. Just before his injury, Cooper had identified himself as a police officer, displayed his badge, and drawn his revolver. Given Cooper's mandatory R.C. 2935.03(A) duty to arrest and detain any person found violating a state law, these circumstances support finding the injury in the course of Cooper's city employment. Indeed, as we noted above, only a peace officer lawfully could have performed as Cooper did. The time and place factors, however, are more difficult to apply. Cooper's off-duty Groceryland work did not conform with the usual time and place of his city employment. On the other hand, peace officers have an ongoing responsibility to stop crime, and Cooper was acting as a peace officer at the specific time and place of his injury. Consequently, the traditional *Fisher* "time, place, and circumstances" test proves somewhat problematic when applied to the facts before us. The time and place of Cooper's injury arguably were consistent with his Groceryland work and his police work. The circumstances surrounding Cooper's injury, however, considered along with the time and place, convince this court that the accident occurred in the course of Cooper's city employment. Although Cooper acted as a private security specialist prior to his injury, that role ceased when he invoked his police authority and attempted to arrest the suspects.[6]

In opposition to this conclusion, the city cites *Evans v. Smith* (1994), 97 Ohio App.3d 59, 66–67, 646 N.E.2d 217, 221–222. In *Evans*, the Hamilton County Court of Appeals considered the conduct of a police officer employed as a grocery

---

**6.** The city disputes this conclusion by arguing that "many professionals in the State of Ohio, including doctors, attorneys, and various contractors, use, in their employment, authority vested in them by licensing agencies, without becoming thereby the workers' compensation risk of the entity from whom their authority is derived while employed by another." The distinction between the situation the city depicts and the present case, however, is that Cooper was acting *on behalf of the government* at the time of his injury. He was not merely using authority conferred upon him by the state to engage in private practice as do many doctors and lawyers. On the contrary, he was exercising his government authority in his role as a city of Dayton employee.

store security guard. The off-duty officer detained and arrested a customer, who subsequently brought suits for malicious prosecution, false arrest, false imprisonment, and a violation of Section 1983, Title 42, U.S.Code. In that case, the court stated: "Regardless of whether Smith was acting as a municipal police officer or as a Kroger security guard or in some hybrid capacity, his authority to arrest and detain Evans was derived from a state statute." The city relies upon this language to support its claim that Cooper remained a private loss-prevention specialist despite invocation of his police authority.

We find the city's reliance upon *Evans* unpersuasive. In *Evans*, the court recognized that the officer's authority to arrest and detain the suspect without a warrant "[arose] under either R.C. 2935.03(B)(1), which empowers a municipal police officer to effectuate a warrantless arrest, or R.C. 2935.041(A) and (E), which authorize a mercantile establishment or its employee to *detain*, and a peace officer to *arrest*, a shoplifter." (Emphasis added). *Id.* at 67, 646 N.E.2d at 222. In either case, however, the court did not dispute that the officer necessarily acted as a police officer when actually arresting the suspect. In fact, the *Evans* court specifically stated: "Smith's arrest of Evans could be effectuated only pursuant to the authority conferred upon a police officer under R.C. 2935.03(B)(1) and R.C. 2935.041(E)." *Id.* at 70, 646 N.E.2d at 224. The *Evans* court simply determined that regardless of whether officer Smith (1) conducted a warrantless arrest or (2) acted first as a private employee and detained the suspect and then acted as a police officer and arrested the suspect, under either set of circumstances, Smith performed under the color of state law for purposes of Section 1983, Title 42, U.S.Code. We agree with the *Evans* court's conclusion. Furthermore, the court's reasoning supports our belief that Cooper necessarily exercised police authority and acted as a city employee when he displayed his badge, drew his revolver, and ordered the suspects to stop. Under such circumstances, we must conclude that Cooper attempted to arrest the suspects—something the *Evans* court acknowledged only a police officer lawfully could do.

The city also relies upon *State v. Glover* (1976), 52 Ohio App.2d 35, 6 O.O.3d 20, 367 N.E.2d 1202, in which an off-duty officer acted as a grocery store security guard. After observing a suspect conceal a piece of sausage, the officer stopped the suspect at the exit, displayed his badge, and attempted to arrest the suspect. The suspect resisted and ultimately faced a resisting arrest charge. Under these circumstances, the Franklin County Court of Appeals stated:

"A duly commissioned police officer holds a public office upon a continuing basis. The officer here remained an officer of the law, and his obligation to preserve the peace was not nullified by the fact he was working for Kroger in this case. Notwithstanding, the officer, even though acting as a private security policeman, had the right and duty to arrest and detain a person who was violating

the law of this state or an ordinance of the city of Columbus until a warrant could be obtained. Therefore, it was not error for the trial court to find appellant guilty of resisting arrest within the facts and circumstances of this particular case." *Id.* at 38, 6 O.O.3d at 22, 367 N.E.2d at 1204.

Initially, we stress our agreement with the *Glover* court's recognition of an off-duty police officer's ever-present responsibility to stop crime. To the extent the opinion suggests such an officer *always* would be acting in both his official police capacity and his private security capacity when making an arrest, however, we disagree. In so doing, we note that the legal issue in *Glover* did not require the court to decide whether the officer was acting as a police officer *and* a private guard simultaneously. Rather, the court needed to find only that the officer acted in his official police capacity to sustain the appellant's resisting arrest conviction. The narrower issue—whether the officer acted as a private security guard *at the same time*—was not before the court. In any event, as we explained above, the officer's off-duty security work provided no legal basis for him to conduct a warrantless arrest. Such statutory authority necessarily resulted solely from his status as a peace officer.

Furthermore, we find the legal issue in the present case—workers' compensation responsibility—significantly different from the issue in *Glover*—criminal responsibility for resisting arrest. In *Fisher, supra,* the Ohio Supreme Court recognized the difficulty in applying "hard and fast rules" to the often unique facts surrounding employment-related injuries. As a result, the court stressed that "no one test or analysis can be said to apply to each and every factual possibility. Nor can only one factor be considered controlling. Rather, a flexible and analytically sound approach to these cases is preferable." *Id.,* 49 Ohio St.3d at 280, 551 N.E.2d at 1276. Adopting this approach in light of the facts before us, we find Cooper's injury to have occurred in the course of his city employment. The time, place, and circumstances of Cooper's injury are more consistent with his city employment than his off-duty Groceryland work.

Applying this same flexible approach, and considering the totality of the circumstances, we also find that Cooper's injury arose out of his city employment. Once again, however, the specific *Lord–Fisher* factors designed to assist in this determination prove somewhat difficult to apply. The first factor considers the proximity of the accident scene to the place of employment. In the present case, however, the accident occurred outside Groceryland in close proximity to the store. However, given Cooper's statutory responsibility as a peace officer to stop crime, his "place of employment" for law enforcement purposes reasonably could be viewed as anywhere he lawfully exercises his authority.[7] Consequently, the

---

7. The city disputes this reasoning, arguing that such a conclusion effectively expands the city's workers' compensation liability exposure to the city limits and jettisons the "place of

proximity factor is consistent with both Cooper's private employment and his police work.

The second factor addresses the employer's degree of control over the accident scene. This inquiry concerns "the amount of control the employer had over the situs of the injury, and not the degree of control the employer had regarding the actions of its employees." *Fisher, supra,* 49 Ohio St.3d at 279, 551 N.E.2d at 1275. This factor too presents some application difficulties. As a practical matter, Groceryland retained day-to-day control of its own parking lot, where Cooper jumped on the speeding car's hood. As the trial court recognized, however, the city police department also retains control of property within the city limits for law-enforcement purposes. Furthermore, the actual injury occurred on a public street as a result of Cooper's statutorily mandated exercise of police authority. Under these facts, we agree that the city exercised substantial control over the accident scene.

The final factor considers the benefit the employer derived from the employee's activity. Here, too, Groceryland, Pawelski (in his private capacity), and the city each benefited from Cooper's conduct. The benefit to Groceryland is obvious—the apprehension of a shoplifter. The benefit to Pawelski is also clear—commendable performance by a worker he recruited and payment from Groceryland. Finally, as the trial court recognized, the city benefited from the apprehension of a criminal and the prevention of harm to citizens or property.

In *Manchester v. Huard* (1973), 113 N.H. 81, 301 A.2d 719, the New Jersey Supreme Court recognized the substantial benefit a political subdivision receives when its police officers perform private security work. That case involved an off-duty police officer injured while working as a private security guard at a restaurant. Finding the city responsible for an injury the officer sustained while arresting a patron for drunkenness, the court reasoned:

"In making an arrest, [the officer] was performing the functions and duties of a police officer. * * * His action related as much to preserving the general public safety as it did to the benefit of Mrs. Bea's [restaurant]. The city had a sufficient continuing interest in what he was doing to make it liable for the injuries he received while he was doing it. * * * The city had a duty to preserve order and the use of police officers for off-duty jobs such as this merely shifted the financial

employment factor" in favor of an "authority" analysis. We agree that our analysis places the city's workers' compensation responsibility at the city limits, but only when a city police officer exercises his police authority within the those limits. Furthermore, like the trial court, we cannot extricate Cooper's lawful exercise of police authority from his place of employment. Despite the city's argument to the contrary, a police officer's "place of employment" logically must include anywhere that he exercises his statutory duty to enforce the law.

burden to others." *Id.* 113 N.H. at 83, 301 A.2d at 720 [8]; See, also, *State v. Wilen* (1995), 4 Neb.App. 132, 146, 539 N.W.2d 650 (noting that although an off-duty police officer's security services benefited a fast-food restaurant, "her goal always was to keep the peace, universally regarded as an official law enforcement duty").

Similarly, in the present case, we conclude that the city received at least as much benefit from Cooper's conduct as did Groceryland, which presumably recovered the stolen meat, or Pawelski, who received the satisfaction of recruiting a dedicated loss-prevention specialist and money from Groceryland for his efforts.

In short, when considering the unusual facts and circumstances of this case, we cannot deny the existence of a causal connection between Cooper's city employment and his injury outside Groceryland. Consequently, we hold that Cooper's injury arose out of his employment with the city of Dayton. While we concede that the *Lord–Fisher* factors do not mesh neatly into the facts before us, we again recognize the Ohio Supreme Court's endorsement of an "analytically sound approach" to workers' compensation cases rather than "the application of hard and fast rules." Guided by the general principles articulated in *Lord* and *Fisher*, as well as the totality of the circumstances, we find that Cooper's injury was received in the course of, and arose out of, his employment as a Dayton police officer.

This conclusion is consistent with case law from other jurisdictions. In *Phoenix v. Indus. Comm. of Arizona* (App.1987), 154 Ariz. 324, 742 P.2d 825, the court reviewed the workers' compensation death benefits of an off-duty police officer who was shot and killed while working as an independent contractor security guard for a motel. In that case, a manager for Sixpence Inns contacted Jimmy B. Townsend, a Phoenix police sergeant, about hiring off-duty police officers to provide security. *Id.* 154 Ariz. at 326, 742 P.2d at 827. Sergeant Townsend subsequently reached an agreement similar to Pawelski's in the present case. Pursuant to his agreement with Sixpence Inns, Townsend agreed to hire and schedule the off-duty officers. *Id.* He also promised that they would know and perform all duties required of them. The agreement provided for Sixpence Inns to pay Sergeant Townsend for the officers' work, and Townsend, in turn, paid the officers. *Id.* Townsend received $25 per month from Sixpence Inns for scheduling and supervising the off-duty officers. As in the present case, officers were required to obtain authorization for off-duty work. *Id.* Unlike the present case, however, the security officers carried two-way police radios and wore full city uniforms.

---

**8.** The *Huard* court also reasoned that the officer's receipt of money for his off-duty work did not shield the city from responsibility. Finally, the court noted that "the procedures used in making the arrest in this case conformed to those used by officers on regular duty rather than those followed by private guards." *Id.*

While working off-duty at a Sixpence Inn, officer John Robertson observed a man in the motel parking lot at approximately 8:45 p.m. The officer asked the man for identification after recognizing him as a person he previously had warned for trespassing. *Id.,* 154 Ariz. at 326, 742 P.2d at 827. As Robertson conducted a warrant check on the man, identified by his drivers' license as Randy J. Harris, two men yelled that Harris had robbed them. When Robertson turned to look at the robbery victims, Harris shot Robertson in the neck. *Id.*

Based upon the foregoing facts, the Arizona appellate court stated:

"In this case, it was stipulated by the parties, and found by the Commission, that the deceased was in the line of duty as a City police officer when he was shot. His on-duty status began when the robbery victim yelled to him that he had been robbed by the subject being questioned. Although the deceased was performing a function of his role as an independent contractor security guard at the time he stopped the subject for questioning, that role ceased as soon as he had reason to believe a felony had been committed. At that point, he became solely an officer of the police department. The evidence is clear that Sixpence Inn had no right to exercise control over his actions when he was engaged in such a function. While we recognized the benefit to Sixpence of the officer's security guard function in stopping and questioning the subject, we find that this was separate and distinct from his obligations as a City of Phoenix police officer and that these roles were not co-existent." *Id.,* 154 Ariz. at 329, 742 P.2d at 830.

While some factual differences exist, we find the court's reasoning in *Phoenix v. Indus. Comm. of Arizona, supra,* persuasive. Cooper acted as either an independent contractor or an employee of Pawelski while performing his off-duty work as a loss-prevention specialist.[9] Although he was performing in his loss-prevention capacity when he observed and followed the shoplifting suspect, Cooper's police officer status began when he identified himself as a police officer, displayed his badge, drew his service revolver, and ordered the suspects to place their hands in the air. At that point, his actions were consistent only with his employment as a Dayton police officer. Neither Groceryland nor Pawelski, in his private capacity, had any authority to control Cooper's conduct at that time. Furthermore, as did the Arizona court, we too recognize the benefit Groceryland received from Cooper's presence. Nevertheless, his conduct as a Dayton police officer was separate and distinct from his conduct as a loss-prevention specialist. See *Manchester v. Huard, supra; Hialeah v. Weber* (Fla.App.1986), 491 So.2d 1204 (finding the city responsible for workers' compensation benefits when an off-

---

9. In its October 8, 1996 decision and order, the trial court did not decide whether Cooper was an independent contractor of Pawelski or Pawelski's employee. Given our determination that Cooper was acting as an employee of the city at the time of his injury, however, we need not determine his status with respect to Pawelski at other times.

duty police officer working as a nightclub guard injured his knee arresting vandals outside the club); *State v. Wilen, supra,* 4 Neb.App. at 145, 539 N.W.2d at 660 (concluding that an off-duty police officer working as a Hardee's security guard "was responding to the events in question in her official capacity as a law enforcement officer"); *Dallas v. Half Price Books, Records, Magazines, Inc.* (Tex.App.1994), 883 S.W.2d 374, 377 (noting that "[w]hen [off-duty officer] Harmon saw a crime being committed, he ceased being an employee or independent contractor of Half Price Books and became an on-duty police officer. As a matter of law, Harmon was an on-duty police officer at all relevant times. As an on-duty police officer, Harmon exercised discretion in the method and manner in which he arrested the deceased.").

In reaching this conclusion, we find insignificant Cooper's lack of a police uniform when injured. Like wearing a police uniform, Cooper's display of his badge constituted a public demonstration of his police authority. Furthermore, regardless of his civilian clothes, Cooper orally identified himself as a Dayton police officer when he attempted to stop the suspects.

Likewise, we find relatively insignificant Cooper's failure to secure permission to work at Groceryland despite department policy requiring officers to obtain prior approval for off-duty work. A copy of the off-duty employment request form Cooper should have completed is included in the record. The form requires officers to acknowledge that they must use sick leave, not injury leave, for injuries sustained while engaged in off-duty work. However, the issue of an officer taking sick leave or injury leave for a moonlighting injury is clearly distinct from the issue of workers' compensation liability. The form is silent regarding an off-duty employer's workers' compensation responsibility.

A separate city personnel policy, however, attached to the city's motion for summary judgment as part of Exhibit K, does address the city's worker's compensation responsibility for off-duty work injuries. The policy statement, dated June 20, 1989, provides:

"The City of Dayton will not be liable for the injury of any employee resulting from, or arising out of, employment with another employer. City employees who are employed during their off-duty hours for a private concern, and who are injured as a result of said employment with such concern, should file Workers' Compensation claims against such private concern."

Under the circumstances of this case, we find the foregoing provision inapplicable. As we explained above, Cooper's injury did not arise out of or result from his off-duty employment. Rather, Cooper sustained his injury while exercising his statutory obligation as a city police officer. Thus, Cooper's injury was received in the course of, and arising out of, his employment with the city. Furthermore, we note that with respect to workers' compensation claims for

injuries sustained *outside* the scope of an officer's official duties, the policy statement has no effect. Pursuant to R.C. 4123.01(C), the city bears responsibility only for injuries received in the course of, and arising out of, the injured employee's city employment. Thus, the form simply states the obvious by purporting to eliminate liability that the legislature already has declared nonexistent.

Finally, to the extent the city might construe the form as shifting *all* workers' compensation liability to private employers for injuries officers sustain in the line of duty, such an argument would raise substantial Fourteenth Amendment questions. In *Bowman v. Twp. of Pennsauken* (D.N.J.1989), 709 F.Supp. 1329, for example, the United States District Court recognized a state's legitimate interest in shifting liability to private employers for an officers' moonlighting work injuries unrelated to law enforcement duties. *Id.* at 1347. At the same time, the court explained:

"It is not a legitimate [state] interest, however, to attempt to shift liability and litigation exposure in all cases, even those where it is judicially determined that the officer was acting in an official capacity." *Id.* See, also, *Benelli v. New Orleans* (La.App.1985), 478 So.2d 1370; *Puckett v. Miller* (Ky.S.Ct.1992), 821 S.W.2d 791, 797 (dissenting opinion).

Given our conclusion, however, that the city personnel provision does not shift responsibility for injuries sustained in the course of, and arising out of, an officer's city employment, we need not address potential constitutional issues. Having determined that Cooper's injury was sustained in the course of, and arising out of, his city employment, we overrule the city's first assignment of error.

In its second assignment of error, the city contends that the trial court erred by failing to grant its summary judgment motion. Given our determination that the city bears workers' compensation responsibility for Cooper's injury, however, the city is not entitled to judgment as a matter of law. Accordingly, we overrule this assignment of error.

In its third assignment of error, the city claims that the trial court erred by awarding Cooper $2,500, the statutory maximum, for attorney fees without granting the city an opportunity to be heard and without adequate evidence to justify the award.

The record reveals that Cooper filed the motion for attorney fees on October 16, 1996 at 3:05 p.m. The motion included a certificate of service stating that Cooper's counsel sent the city a copy of the motion by "regular U.S. mail on the date of filing." On October 17, 1996, at 3:23 p.m., the trial court filed a decision and judgment entry granting Cooper's motion for the statutory maximum attor-

ney fees. Under these circumstances, the city obviously had no opportunity to respond to the motion.

Furthermore, an affidavit from Cooper's attorney, James A. Hensley, Jr., accompanied the motion but stated only (1) that Hensley charged $100 per hour for his services and (2) that his present charges for work on Cooper's case were $2,500. In *Perry v. LTV Steel Co.* (1992), 84 Ohio App.3d 670, 680, 618 N.E.2d 179, 185, however, the Cuyahoga County Court of Appeals recently stated that the calculation of an attorney fees award in workers' compensation cases "should not merely involve multiplication of hours expended by counsel times a base rate."

We find the *Perry* court's reasoning particularly applicable in the present case, where the city did not receive even an opportunity to respond to the motion. Additionally, as the city notes, the trial court decided the present case on summary judgment after considering primarily evidence Cooper already had submitted in the administrative proceedings before the Industrial Commission. Given the lack of notice to the city and Cooper's attorney's failure to demonstrate that the statutory maximum award was reasonable, we sustain the city's third assignment of error. Accordingly, we reverse the trial court's judgment awarding attorney fees and remand this cause for an evidentiary hearing solely on the issue of appropriate fees.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

WOLFF and GRADY, JJ., concur.